**UNITED STATES of America ex rel. Ciro M. CARUSO, N. J. S. P. No. 56349, Appellant,**

v.

**UNITED STATES BOARD OF PAROLE.**

No. 77–1253.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1977.

Decided Jan. 5, 1978.

---

David A. Ruhnke, Asst. Federal Public Defender, Newark, N. J., for appellant; Martin C. Aronchick, law student, on the brief.

Jonathan L. Goldstein, U. S. Atty., Newark, N. J., for appellee; Ralph A. Jacobs, Asst. U. S. Atty., Newark, N. J., on the brief.

Before ADAMS and GARTH, Circuit Judges, and LAYTON,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal presents the question expressly reserved in *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976): whether the lodging of an unexecuted federal parole violator warrant as a detainer with state prison authorities violates the due process rights of a state prisoner when he is not afforded an immediate parole revocation hearing. *Id.* at 88, 97 S.Ct. 274. We hold that it does not.

I.

In 1964 the appellant, Ciro Caruso, was convicted of bank robbery in federal court in Connecticut, and was sentenced in 1965 to a 16 year term. In December, 1971, Caruso was paroled with 3,493 days remaining to be served on his federal sentence.

In May, 1974, while on parole, Caruso was arrested in New Jersey on narcotics charges and released on bail. In August, 1974 he was again arrested for drug offenses and

* Honorable Caleb R. Layton, 3rd, Senior United States District Judge for the District of Delaware, sitting by designation.

again released on bail. On October 7, 1974 he was arrested for his failure to appear in New Jersey state court and was jailed. On October 31, 1974 the United States Board of Parole,[1] having learned of the narcotics charges, issued a parole violator warrant and lodged it as a detainer with New Jersey officials.[2]

Caruso pled guilty in state court to charges of possession and distribution of heroin and cocaine and on April 9, 1975, was sentenced to a 14 to 20 year state prison term. On April 29, 1975, federal parole authorities notified Caruso that a detainer had been lodged with New Jersey prison officials and that a dispositional review would be undertaken shortly.[3] Caruso responded by letter, asking that the warrant be executed so that his federal parole violation term could run concurrently with the state sentence. He argued to the Board that his drug dealing had been precipitated by his drug habit, and that New Jersey officials were denying him access to prison programs because of the federal detainer. In addition to this information, the Parole Board received reports on Caruso from New Jersey authorities.

The Regional Director of the Parole Board conducted Caruso's dispositional review without a hearing, and decided to let the warrant remain unexecuted and stand as a detainer. Caruso was so notified on November 28, 1975 by a Notice of Action.

The Notice also informed him that the Regional Director's decision could be appealed to the National Appeals Board within 30 days. Caruso did not appeal. Instead, on June 4, 1976 he filed a petition for a writ of habeas corpus in the federal district court for the District of New Jersey. The petition was dismissed with prejudice on December 30, 1976.

## II.

The initial question presented is whether this court's decision in *United States ex rel. Sanders v. Arnold,* 535 F.2d 848 (3d Cir. 1976), requires that Caruso's habeas petition be dismissed because of his failure to exhaust his administrative remedies. In *Sanders* a federal prisoner petitioned for habeas relief from decisions of the Parole Board executing a parole violator warrant and revoking his parole. This court held that the petition had to be dismissed because Sanders had failed to take an administrative appeal within 30 days from these determinations, as was his right.[4] The Government argues here that Caruso's failure to appeal to the National Appeals Board requires the same result.

We would agree, but for one important distinguishing factor. In this case we have been informed by counsel for the Parole Commission that under the Commission's present practice, the Regional Com-

---

1. The United States Board of Parole was replaced by the United States Parole Commission pursuant to the Parole Commission and Reorganization Act of 1976, Pub.L. 94–233, 90 Stat. 219 *et seq.,* 18 U.S.C.A. §§ 4201–4218 (West Supp.1977) [hereinafter referred to as the 1976 Act].

2. The warrant application charged four violations of Caruso's conditions of release: 1) possession of a controlled substance; 2) failure to report his arrest to his probation officer; 3) failure to submit monthly supervision reports; 4) sale of heroin.

3. Under the regulations then in effect, 28 C.F.R. § 2.53 (1975) (promulgated pursuant to 18 U.S.C. §§ 4205 & 4207 (1970) (now repealed)), when a prisoner on parole, sentenced on new charges, is serving a new sentence, the parole violator warrant can be lodged as a detainer. The Regional Director must then determine

whether to: 1) let the detainer stand; 2) withdraw the detainer and either close the case if the parole expiration date has passed or permit the federal parole sentence to run uninterruptedly from the time of original release; or 3) execute the warrant (and hold a revocation hearing). The Regional Director may in his discretion hold a hearing, designated a "dispositional interview," before making his decision.

This procedure was codified in a modified but substantially similar form by the 1976 Act, 18 U.S.C.A. § 4214(b). The current regulations governing this procedure, promulgated pursuant to § 4214(b) of the Act, are at 42 Fed.Reg. 39816, 28 C.F.R. § 2.47 (1977). The 1976 regulations were identical to those of 1977 in this respect. 28 C.F.R. § 2.47 (1976).

4. Sanders had been informed of this right in the Board's Notice of Action letters.

missioner's decision not to hold an immediate revocation hearing (*i. e.,* not to execute a parole violation warrant and to let it stand as a detainer) is no longer considered to be a decision subject to the administrative appellate review process.[5] It would appear, therefore, that Caruso no longer has a fruitful avenue of administrative review.[6] Thus, for us to dismiss Caruso's petition in order to require that he exhaust administrative remedies would be meaningless. Accordingly, relying on the representations made to us by counsel, we will proceed to the merits, although we freely admit that the subject of administrative appellate review in the present context is somewhat cloudy.

### III.

Caruso has a two-fold complaint with respect to the lack of an immediate parole revocation hearing.

First, he complains of the lack of a prompt hearing as it could affect his first (the federal) sentence. He argues that as memories fade and witnesses disappear, his ability to prove mitigating circumstances and to convince the Parole Board that he should not be re-imprisoned to complete his first sentence, will be substantially impaired.

Second, he complains of the effect of the unexecuted warrant-detainer on his second (the present state) sentence. He contends that the existence of the detainer disqualifies him from many state rehabilitative programs, and reduces his opportunity for an early parole. He explains that the state parole authorities will be less likely to grant him an early parole date because of the existence of the federal detainer and because he will not have participated in rehabilitative programs.

### A. First (Federal)-Sentence Effect

■ It is at least clear from *Moody* that a federal parolee, when convicted of and imprisoned by federal authorities for another crime committed while on parole, has no right to a prompt revocation hearing upon the issuance of a parole violator warrant based on that second crime. The Supreme Court in *Moody* appeared to hold that a parolee in prison on another charge has no liberty interest in a prompt revocation hearing *per se.* The Court there reasoned that Moody's present confinement derived not from the outstanding parole violator warrant, but from his subsequent conviction, stating:

Petitioner's present confinement and consequent liberty loss derive not in any sense from the outstanding parole violator warrant, but from his two 1971 homicide convictions. Issuance of the warrant and notice of that fact to the institution of confinement did no more than express the Board's intent to defer consideration of parole revocation to a later time. Though the gravity of petitioner's subsequent crimes places him under a cloud, issuance of the warrant was not a determination that petitioner's parole under his 1962 rape conviction will be revoked; the time at which the Commission must make that decision has not yet arrived. With only a prospect of future incarceration which is far from certain, we cannot say that the parole violator warrant has any present or inevitable effect upon the liberty interests which *Morrissey* [*Morris-*

---

5. There does not appear to be any difference in the applicable regulations. Nonetheless the Commission apparently now interprets the regulations so as not to require administrative appellate review of such decisions.

6. Apparently, Caruso would be relegated to annual reviews of the detainer by the Regional Commissioner, whose determinations are not now subject to administrative review. In this regard we note that the 1975 regulations provided for annual review of detainer determinations. 28 C.F.R. § 2.53(c) (1975). The 1976

Act, as well as the 1976 and 1977 regulations promulgated pursuant thereto, 28 C.F.R. § 2.47 (1976); 28 C.F.R. § 2.47 (1977), do not appear to require such annual review. In *Moody,* the Court stated that the "1976 Act abolishes the annual status review formerly required." Nonetheless, we have been informed by the Parole Commission's counsel that the Commission's Internal Procedures Manual specifies that there be yearly review of the status of an unexecuted parole violator detainer.

*sey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484] sought to protect. Indeed, in holding that "[t]he revocation hearing must be tendered within a reasonable time after the parolee is taken into custody," *Morrissey,* 408 U.S., at 488 [92 S.Ct. 2593], we established execution of the warrant and custody under that warrant as the operative event triggering any loss of liberty attendant upon parole revocation. This is a functional designation, for the loss of liberty as a parole violator does not occur until the parolee is taken into custody under the warrant. *Cf.* 18 U.S.C. § 4206; 18 U.S.C.A. § 4213(d) (June 1976 Supp.)

429 U.S. at 86–87, 97 S.Ct. at 278.

*Moody* controls in this case.[7] The fact that the second sentence being served by Caruso is a state sentence, can make no difference on the effect which the detainer may have on his first (the federal) sentence.

Caruso has not pointed to any evidence of significant mitigating circumstances[8] which might distinguish this case from *Moody.* In *Moody* no claim of mitigating circumstance was made and thus there was

no danger that such evidence might be lost if a prompt hearing was denied. 429 U.S. at 88 n. 9, 97 S.Ct. 274. Whether a different case would be presented if there were a substantial claim of mitigating evidence, we need not decide here.[9]

## B. Second (State)-Sentence Effect

▮ Caruso urges that he should be granted an immediate revocation hearing because the existence of the federal detainer denies him access to prison programs, and thereby lengthens the time he must spend in state prison since state parole authorities will look unfavorably upon his lack of participation in such programs.

The Supreme Court was faced with a similar argument in *Moody,* but rejected it on the ground that the same Parole Commission could consider, at parole application hearings, Moody's second sentence parole as well as the revocation of his parole under his first sentence.

The statutory hearing to which petitioner will be entitled upon his application for release on parole will give him the same full opportunity to persuade the

---

7. The disputed Parole Board determinations in our case were governed by the former Act and the 1975 regulations, as were the actions of the Parole Board in *Moody.* The pre-1976 regulations had no stated policy as to whether a parole violator term would be consecutive to, or concurrent with, the intervening sentence. The post-1976 regulations, however, state that it is the Commission's "firm policy" that such term "run consecutively to any term imposed for the new offense." 28 C.F.R. § 2.47(c) (1977). This policy, however, does not affect our decision. The Supreme Court recognized this policy in *Moody,* 429 U.S. at 85, 97 S.Ct. 274, but held nevertheless that there is no loss of liberty until the parolee is taken into custody on the violator warrant. While it may be arguable that the prospect of future incarceration is now almost certain, and therefore a prompt revocation hearing is required, we are governed by the Supreme Court's holding that there is no loss of liberty until the violator warrant is executed.

8. The only specific mitigating circumstance to which Caruso refers is the fact of his drug addiction, the support of which he claims was the reason he sold narcotics. We do not find this to be a "substantial mitigating circumstance." *See* 28 C.F.R. § 2.47(c) (1977).

9. Given the present policy of the Commission, 28 C.F.R. § 2.47(c), it may well be that a credible claim of "substantial mitigating circumstances" imposes on the Parole Commission the obligation of holding an immediate dispositional (as distinct from a revocation) hearing at which the parolee could preserve evidence. *See* 18 U.S.C.A. § 4214(b)(2) (West Supp.1977), 28 C.F.R. § 2.47 (1977); 429 U.S. at 88 n. 9, 97 S.Ct. 274. In certain circumstances it may be required that the Regional Commissioner permit a parolee to place mitigation evidence on the record, thereby preserving it for a subsequent revocation hearing.

It would be unreasonable to force an immediate revocation hearing, thereby denying the Parole Board (and the parolee) the benefit of the state institutional record, a valuable input into the Board's decision as to the parolee's ability to live in society. *See* 429 U.S. at 89, 97 S.Ct. 274, 279. "Given the predictive nature of the [parole revocation] hearing, it is appropriate that such hearing be held at the time at which prediction is both most relevant and most accurate—at the expiration of the parolee's intervening sentence." *Id.*

Commission that he should be released from federal custody as would an immediate hearing on the parole violator warrant. 429 U.S. at 88, 97 S.Ct. at 279. The Court, however, did not consider the situation now confronting us, *i. e.,* where there is the "prospect of adverse action by different and autonomous parole authorities." *Id.*

We must reject Caruso's contentions made in the case before us. We ascertain no grievous loss suffered by Caruso due to the Board's failure to execute the parole violator warrant and hold an immediate revocation hearing. The harm he foresees is far too uncertain and inchoate to rise to the level of a deprivation of a liberty interest. Indeed, there is no basis in this record to support Caruso's arguments, other than his unsubstantiated allegations.

Moreover, as we interpret Caruso's complaint, it consists of no more than a charge that the state has taken or will take arbitrary and capricious actions against him based on the existence of the federal detainer. He does not—nor can he—charge that the federal Parole Board is denying him access to prison programs or parole because it has issued a parole violator warrant on the basis of his guilty plea to narcotics charges.[10] If our interpretation is correct, it is the State of New Jersey, not the federal authorities, which is allegedly depriving Caruso of his "rights". As such, whatever the basis for Caruso's charges (and we express no view as to their validity), the appropriate targets for Caruso's attack are state prison officials and the state parole authorities.

Indeed, if Caruso had been afforded an immediate revocation hearing, he would most likely be in the same position *vis a vis* his state sentence: he would almost certainly have been sentenced to a consecutive parole violation term, *see* 28 C.F.R. § 2.47(c) (1977), and the Commission would have lodged a detainer with New Jersey prison officials. In such a case he could not have

asserted the complaint he asserts here against the Parole Board. In our view, the possibility of such a hypothetical situation brings into sharp relief the fact that Caruso's complaint is in reality directed at the actions of New Jersey officials, and cannot be remedied by federal authorities.

We therefore hold that a state prisoner is not entitled to an immediate revocation hearing by federal parole authorities when an unexecuted federal parole violator warrant is lodged with state prison officials as a detainer, at least where the warrant is based on a state conviction for a felony, which was committed while the prisoner was on federal parole. This result is in accord with the views expressed in *United States ex rel. Hahn v. Revis,* 560 F.2d 264 (7th Cir. 1977) and *Hicks v. Board of Parole,* 550 F.2d 401 (8th Cir. 1977). The court in *Larson v. McKenzie,* 554 F.2d 131 (4th Cir. 1977) (per curiam) reached the same result when a state parole violator warrant was lodged as a detainer with prison officials of another state, a functionally equivalent situation to the case *sub judice. See also Gaddy v. Michael,* 519 F.2d 669 (4th Cir. 1975).

## IV.

The order of the district court, which dismissed with prejudice Caruso's petition for a writ of habeas corpus, will be affirmed.

ADAMS, Circuit Judge, dissenting.

Ciro Caruso, a prisoner of the State of New Jersey, and the appellant in this case, claims that he has "fallen between the cracks" of federal and state prison procedures. According to Caruso's version of his situation, a federal parole-violator warrant that has been lodged against him as a detainer has barred him from participation in drug-rehabilitation and work-release programs which could shorten his state confinement and offer him the opportunity of successful reintegration into society.

---

10. This circumstance, if no other, distinguishes this situation from that hypothesized by the dissent in its note 22.

The federal detainer is pending because of a decision by the United States Parole Board[1] to defer consideration of Caruso's case until he leaves the New Jersey prison system. Yet Caruso's New Jersey release is, itself, delayed by his exclusion from rehabilitation programs as a result of the existence of the detainer. Since the Parole Board decision which forms the centerpiece of Caruso's petition was reached without a hearing, Caruso asserts that he has been deprived of liberty without due process of law.

Inasmuch as I am convinced that Caruso's habeas corpus petition warrants, at a minimum, an evidentiary hearing, I respectfully dissent.

### A.

Caruso was paroled in December 1971, from a 16-year federal bank robbery sentence, with almost ten years remaining to be served. In 1974 he was twice arrested in New Jersey on drug charges, and on April 9, 1975 pleaded guilty to counts of possession and distribution of heroin and cocaine. Caruso was then sentenced to a prison term of 14 to 20 years for the drug violations.

Twenty days after his sentencing, Caruso was advised that the federal parole authority had lodged a parole violation warrant with the New Jersey prison system as a detainer. Caruso informed the federal authorities by letter that his involvement in narcotics distribution had been forced upon him by his own drug dependence. Moreover, the letter stated, the federal detainer prevented his participation in New Jersey's drug treatment and other rehabilitation programs.

Without a hearing, however, the Regional Director of the Parole Board decided to let the detainer stand, unexecuted. Caruso then filed the present *pro se* petition for *habeas corpus*, charging that the failure by the Parole Board to hold a prompt hearing denied him due process.

The district court dismissed the petition, without requiring a hearing or affidavits expanding the record, on the ground that *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), then recently decided, precluded Caruso's claim. Caruso promptly appealed.

### B.

My analysis of the issues begins with the effect of the federal detainer. Caruso asserts that, according to New Jersey practice, the federal detainer prevents his participation in drug treatment and other rehabilitation programs otherwise available to state prisoners. Since we here deal with a dismissal of a habeas corpus petition without a hearing or affidavits expanding the record, we must take as true the facts alleged by the petition, unless they are patently frivolous.[2] This rule is particularly appropriate here, in view of the fact that the petition before the Court was prepared *pro se*. Moreover, we need not depend entirely on Caruso's allegation as to the effect of the federal detainer, for we have a statement of a sister court of appeals that New Jersey follows a "per se rule that prisoners with detainers outstanding against them cannot be considered for prison release programs."[3]

Caruso is now 38 years old. The only realistic hope that he will become a productive citizen in our society is that he can be paroled before the end of his minimum 14 year state sentence. But, if, as Caruso claims, he is addicted to drugs, it is not difficult to conclude that his condition, unless remedied, stands as a formidable barri-

1. At the time the detainer was lodged, federal paroling authority was vested in the United States Parole Board. 18 U.S.C. § 4201 *et seq.* (1970). Effective May 15, 1976, however, the authority was transferred to the United States Parole Commission. 18 U.S.C. § 4201 *et seq.* (1976). Since the "Parole Board" made the initial decision to defer consideration of Caruso's claim, and was named as defendant in this action, I have used a single term to refer to both the "Parole Board" and its successor, the "Parole Commission".

2. *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

3. *Shelton v. Taylor*, 550 F.2d 98, 103 (2d Cir. 1977).

er both to institutional progress and to parole eligibility. And he is foreclosed from eligibility for the reduction of sentence available for "work time" under a state statute[4] for the same cause. These deprivations are, of course, "grievous losses" for Caruso.

Under the current decisions of the Supreme Court, however, due process does not mandate limitations on government action unless the "nature" of the burden imposed by the conduct may be fairly characterized as a deprivation of "liberty" or "property."[5]

In this case, loss has come about because the Federal Parole Board has lodged a detainer against a state prisoner. The controlling question, therefore, is whether the Board's action deprived Caruso of "liberty" under the particular facts of this proceeding.

"In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed."[6] Consequently, the Supreme Court has recognized "liberty" for due process purposes as extending far beyond mere freedom from physical restraint. Personal security from physical violence;[7] freedom to take advantage of employment opportunities;[8] and one's interest in "reputation, good name and integrity"[9] have all come within the ambit of the term "liberty." Nor does incarceration even after due process at trial extinguish interests within the core value of freedom from restraint. The Supreme Court has held that prisoners retain "liberty interests" in the right to remain on parole;[10] the right to retain "good time" credit toward remission of sentences;[11] and the right to avoid solitary confinement.[12]

In the case before us, Caruso avers that the federal detainer not only operates to impair his opportunities for parole, rehabilitation and remission of sentence, but that it effectively bars him from the possibility of achieving normalcy. This comes about, he argues, because of the consequences which New Jersey attaches to his classification by federal officials. In this latter aspect, Caruso's claim shares much in common with the contentions upheld by cases which establish that governmental infliction of "stigma" or harm to "good name, reputation, honor, or integrity" must be preceded

---

**4.** N.J.Stat.Ann. 30:4–92 (prison sentence may be reduced at the rate of one day for every five days spent in gainful employment and three to five days per month for "honor farm" work).

**5.** See e. g., *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Goss v. Lopez*, 419 U.S. 565, 575–76, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Wolff v. McDonnell*, 418 U.S. 539, 555–558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Board of Regents v. Roth*, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The insistence on a finding of a "liberty" or a "property" interest which must be identified only by reference to positive law, however, has been criticized by commentators as manifesting too narrow and rigid a conception of the rights guaranteed by the Constitution and as being internally inconsistent. *See* Monaghan, *Of "Liberty" and "Property"*, 62 Cornell L. Rev. 405 (1977); Van Alstyne, *Cracks in the "New Property": Adjudicative Due Process in the Administrative State, id.* at 445; Tushnet, *The Newer Property: Suggestion for The Revival of Substantive Due Process*, 1975 *Supreme Court Review* 261; Comment, *Entitlement, Enjoyment and Due Process of Law*, 1974 *Duke L. J.* 89; Comment, *Two Views of a Prisoner's Right to Due Process: Meachum v. Fano*, 12 *Harv. Civ. Rights Civ. Lib. L. Rev.* 405 (1977); *The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 86–104 (1976).

**6.** *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**7.** *Ingraham v. Wright, supra*, 97 S.Ct. 1401.

**8.** *Board of Regents v. Roth, supra* 408 U.S. at 572–73, 92 S.Ct. 2701.

**9.** *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

**10.** *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**11.** *Wolff v. McDonnell*, 418 U.S. 539, 555–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**12.** *Id.* 408 U.S. at 571–72 n. 19, 92 S.Ct. 2701.

by a due process hearing.[13] The harm in both situations comes about as a result of the conjunction of the classification of a citizen by the government, and the reaction of others to such classification.

The damage to "a good name," or the loss of the opportunity to be viewed as others are viewed, has been held to be a deprivation of a liberty interest, when the harm was inflicted through the medium of a designation, by the Attorney General, of an organization as "Communist,"[14] by expulsion of a citizen from government employment for alleged disloyalty,[15] by "posting" as an excessive drinker to whom liquor could not thereafter be sold,[16] and by suspension of a student from school.[17]

Recently, in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court reexamined this line of cases. While reaffirming their vitality, the Court declared that these cases did not establish that "reputation," *per se*, constituted a liberty interest. Rather, according to

the Court, due process rights arise only in the situation of "an alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards."[18] More generally, due process was said to attach when, as a result of the state action complained of, "a right or status previously recognized by state law was distinctly altered or extinguished."[19]

The action by the Federal Parole Board here constitutes such an alteration in legal status. In lodging the detainer, the Parole Board took Caruso out of the status of mere "prisoner" to which the New Jersey courts had sentenced him, and imposed upon him a new and far less desirable status. The change places Caruso in "custody" of the United States for the purposes of habeas corpus,[20] and it imposes significant enough restraints in the case of a criminal detainer to trigger the Sixth Amendment right to a speedy trial.[21] Just as the loss of reputa-

**13.** *Board of Regents v. Roth, supra* 408 U.S. at 573, 92 S.Ct. at 2707, *Wisconsin v. Constantineau, supra* 400 U.S. at 437, 91 S.Ct. 507.

**14.** *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 161, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J. concurring).

**15.** *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (dictum).

**16.** *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1972).

**17.** *Goss v. Lopez*, 419 U.S. 569, 574, 95 S.Ct. 729 (1975).

**18.** 424 U.S. 693 at 709, 96 S.Ct. 1155 at 1164, 47 L.Ed.2d 405. Such changes of status, the court noted, attend termination of government employment, the loss of tax exemption, the foreclosure from future government employment, the deprivation of a previously held legal right to purchase liquor, suspension from school and revocation of a drivers license. 424 U.S. at 701–711, 96 S.Ct. 1155. This analysis was followed in *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), in which the Supreme Court held that no liberty interest was damaged under *Paul* and *Constantineau* where the reasons for discharging an employee were not made public. *Cf. Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (per curiam) (no necessity for hearing where no falsehood alleged in the classification and no discretionary findings were involved in the classification).

**19.** *Id.* at 711, 96 S.Ct. at 1165.

**20.** *Braden v. 30th Judicial District*, 410 U.S. 484, 498–99, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973).

**21.** *Smith v. Hooey*, 393 U.S. 374, 378, 89 S.Ct. 575, 577, 21 L.Ed.2d 607 (1969), the Court stated:

At first blush it might appear that a man already in prison under a lawful sentence is hardly in a position to suffer from "undue and oppressive incarceration prior to trial." [as a result of a detainer]. But the fact is that delay in bringing such a person to trial on a pending charge may ultimately result in as much oppression as is suffered by one who is jailed without bail upon an untried charge. . . . Under procedures now widely practiced, the duration of his present imprisonment may be increased, and the conditions under which he must serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him.[8]

[8] . . . The existence of an outstanding criminal charge no longer automatically makes a prisoner ineligible for parole in the federal prison system. 28 CFR § 2.9 (1968); see Rules of the United States Board of Parole 17–18 (1965). But as late as 1959 the Director of the Federal Bureau of Prisons wrote: 'Today the prisoners with detainers are evaluated individually but there remains

tion and more tangible injuries flow from "posting" or placing a group on a list of "Communist organizations," Caruso's loss as a result of his altered status in the eyes of New Jersey authorities flows from the action of the federal government in lodging the detainer.

Caruso's opportunity for parole, remission of time, and rehabilitation have been substantially impaired by a change in his legal status wrought by the federal government. In my view, this deprives him of a liberty interest sufficient to call forth the guarantee of due process.[22]

### C.

The conclusion that Caruso has been deprived of a liberty interest adequate to require due process is not, as had been suggested, undermined by the decisions of the Supreme Court in *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976).

In *Meachum*, the Court rejected a prisoner's contention that *"any"* change in the conditions of confinement having a substantial "adverse impact on the prisoner in-

volved is sufficient to invoke the protection of the Due Process Clause." [23] The plaintiff prisoners in *Meachum* challenged their transfer from a minimum security to a more restrictive maximum security institution.[24] The Court held that the nature of the interest infringed was not of the type protected by the due process clause, for no expectation could grow out of state law that the prisoner would be assigned to a particular prison, or that he would not be transferred to another program. To hold otherwise, the Supreme Court asserted, "would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." [25]

Considerations undergirding the decision in *Meachum* are absent in this case. No attempt is being made by Caruso to interfere with the discretion of administrators in the day-to-day operation of the New Jersey prison system. Nor does his petition claim that prisoners cannot be classified in response to the expert opinions of state officials. Rather, Caruso asks that a resolution by the United States Parole Board, in a procedure already the subject of due proc-

---

a tendency to consider them escape risks and to assign them accordingly. In many instances this evaluation and decision may be correct, for the detainer can aggravate the escape potentiality of a prisoner.' Bennett, "The Last Full Ounce," 23 Fed.Prob. No. 2, p. 20, at 21 (1959). *See also* Note, Detainers and the Correctional Process, 1966 Wash.U. L.Q. 417, 418–423.

Indeed, the reason that the speedy trial has been held to be activated at the time of arrest or detainer is that the consequences of those acts "may seriously affect the defendants liberty." *U. S. v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). *See Klopfer v. North Carolina*, 386 U.S. 213, 221, 87 S.Ct. 988, 992, 18 L.Ed.2d 1 (1967). ("The petitioner is not relieved of the limitations placed upon his *liberty* by the prosecution merely because its suspension permits him to go whithersoever he will. The pendency of the indictment may subject him to public scorn and deprive him of employment and almost certainly will force curtailment of his speech, associations and participation in unpopular causes"). (emphasis supplied).

**22.** The majority places weight on the fact that it is New Jersey, rather than the United States which denies Caruso access to treatment and parole. Majority opinion at 1155. The fact that Caruso's deprivation results also from the reactions of New Jersey officials to the detainer is no more relevant, in our judgment, than the fact that the obloquy of "posting" results from the reaction of the community to allegations of drunkenness, or that the damage from the Attorney General's characterization of one as a "Communist" stems in large measure from the reactions of other government agencies or the public.

**23.** 427 U.S. at 224, restated at 225, 96 S.Ct. at 2538 (emphasis in original).

**24.** The transfers also claimed as deprivations a loss of a laundry business, loss of a job as a plumber, and separation from "counsel with whom [the prisoner] had a good relationship." 427 U.S. at 235 n. 7, 96 S.Ct. at 2543 (Steven, J. dissenting).

**25.** 427 U.S. at 225, 96 S.Ct. at 2538. See also *id.* 228–29, 96 S.Ct. 2532.

ess limitations,[26] provide for a hearing when the action operates effectively to deny him the opportunity for rehabilitation and parole.

The determination by the Supreme Court that not every change in conditions of confinement necessitates due process surely does not imply that no change in conditions of confinement can ever deprive a prisoner of "liberty." Indeed, such an implication is negated by the fact that the Court in *Meachum* did not purport to overrule the decision in *Wolff v. McDonnell*[27] that the imposition of solitary confinement and a loss of statutory "good time" credits are deprivations of "liberty."

In *Moody v. Daggett*, the Supreme Court dealt only with the question whether the lodging of a *federal* parole violator detainer against a *federal* prisoner, in and of itself, entitled the prisoner to a prompt hearing on the underlying violation. In support of his contention, the prisoner relied on the holding in *Morrissey v. Brewer*[28] that due process entitled a parolee to a hearing before his parole could be revoked. The Court stated that the filing of the detainer had no "present or inevitable effect" upon the type of liberty interests which *Morrissey* sought to protect,[29] and that the collateral consequences of the detainer filed against Moody did not implicate a liberty interest sufficient to activate due process guarantees.

On the subject of Caruso's contention that the failure to hold a hearing deprives him of the opportunity to have his federal sentence run concurrently with his state sentence, I agree with the majority. *Moody* can be read to bar relief in this respect, for, as in *Moody*, the Parole Board is empowered to grant retroactively the equivalent of concurrent sentences when it finally considers Caruso's case.[30] As to the effect of the detainer on Caruso's state incarceration, however, I believe that *Moody* is distinguishable from the case at hand.

In contrast to the situation presented in *Moody*—involving a federal detainer against a federal prisoner—Caruso is a prisoner of the State of New Jersey. This federal-state interaction casts a different light on the lodging of the detainer. As the majority concedes, the evaluation by the Supreme Court of the claim in *Moody* was specifically tied to the situation of a *federal* detainer lodged against a *federal* prisoner. The Supreme Court held that in view of the fact that the same parole board that lodged the detainer would pass on the prisoner's application for parole on the second sentence, no liberty interest was implicated by the shadow cast on parole eligibility by the detainer. The hearing on an application for parole on the second sentence would also take into account the factors to be presented in a revocation hearing. The Court, in *Moody*, specifically reserved the question "whether different issues would be presented by the prospect of adverse action by different and autonomous parole authorities."[31] Such differences are present here.

---

26. *See Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

27. 418 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

28. 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

29. 429 U.S. at 87, 97 S.Ct. 274.

30. *See Moody, supra*, 429 U.S. at 87, 97 S.Ct. 274.

31. 429 U.S. at 88, 97 S.Ct. at 279. I acknowledge that several circuits have read *Moody* to extend to the federal-state context, or analogously to interactions between two states. *Hicks v. U. S. Board of Parole*, 550 F.2d 401 (8th Cir. 1977) (federal-state); *Larson v.*

*McKenzie*, 554 F.2d 131 (4th Cir. 1977) (state/state); *United States ex rel. Hahn v. Revis*, 560 F.2d 264 (7th Cir. 1977) (federal/state). The Eighth Circuit, however, has expressly reserved the question of what effects *Moody* might have in a situation where a detainer is alleged to impair parole eligibility. *United States v. Johnson*, 563 F.2d 362, at 364–365 (8th Cir. 1977). And two other circuits have left open the reading which they would give *Moody* in particular factual situations. *United States v. Williams*, 558 F.2d 224 (5th Cir. 1977) (leaves open case where delay impairs ability to present evidence of mitigating circumstances); *Shelton v. Taylor*, 550 F.2d 98 (2d Cir. 1977) (reserving issue where detainer destroys eligibility for prison release programs).

First, the authorities who will pass on Caruso's parole from New Jersey differ from those who will eventually evaluate the status of his federal detainer. Where no evidentiary hearing has been held, it seems that it is not beyond the bounds of judicial competence to assume that New Jersey parole authorities will look with disfavor on the existence of an outstanding federal parole violator warrant. This is true despite the fact that the detainer represents no more than an *ex parte* determination by the Federal Parole Board that it wishes more time for decision regarding Caruso's alleged parole violation.[32] Since this is not a federal-federal context, we cannot hypothesize that the state parole authorities will accurately construe the actions of their federal counterparts. Due process does not demand that the agent of one sovereign probe the meaning of an act of the agents of another sovereign in reaching a decision. But where the acts of the second sovereign supply the first with highly prejudicial and potentially erroneous information, due process would seen to require the actions to proceed in accord with a basically fair procedure.

Second, the New Jersey State prison system differs from the federal system in the treatment it accords to detainers. According to information before the Supreme Court in *Moody*, the lodging of a detainer against a federal prisoner does not preclude consideration for rehabilitative programs.[33] Caruso's petition alleges, however, that under New Jersey practice, the existence of the detainer bars him completely from rehabilitative programs. Similarly, in excluding Caruso from access to programs providing remission of sentence for days spent in constructive employment the effect of the detainer exceeds that imposed in the federal system where no comparable opportunity for remission is available.[34]

The loss imposed on Caruso in state custody is decidedly more drastic than the one which Moody suffered at the hands of the federal system, and such loss directly diminishes Caruso's ultimate opportunity for liberty. If Caruso fails to participate in drug rehabilitation programs, taking his allegations as true, the drug dependence which has warped his existence will continue unabated. As a result he will undoubtedly be a significantly less attractive parole prospect, notwithstanding the fact that his failure to take treatment results from the effect of a federal detainer. And even the opportunity available to other prisoners of reducing his sentence by constructive employment remains closed to him. The holding in *Moody v. Daggett*, that the adverse effect of the detainer on classification status did not make out a deprivation of liberty, therefore would not appear to govern in this case.[35]

**32.** See *United States v. Johnson, supra* at 365 n. 5 (studies find that "detainers routinely considered in parole decisions, can have serious adverse effects on the prisoner's chances of parole").

**33.** *Bureau of Prisons Policy Statement,* 7300:112 para. 9 (Apr. 18, 1976), *cited at* 429 U.S. 78, 94 n. 8, 97 S.Ct. 274, 50 L.Ed.2d 236 (Stevens, J. dissenting).

**34.** *Cf.* 18 U.S.C. § 4082(c)(2).

**35.** It can also be argued that the federal-state relation alters the nature of the governmental action which we review. In *Moody*, the Supreme Court noted that "A detainer in this [federal-federal] context is an internal administrative mechanism to assure that an inmate subject to an unexpired term of confinement will not be released from custody until the jurisdiction asserting parole violation has had an opportunity to act . . . . When two autonomous jurisdictions are involved, as for example when a federal detainer is placed against an inmate of a state institution, a detainer is a matter of comity." 429 U.S. 80–81, n. 2, 97 S.Ct. 275. The federal detainer as characterized by *Moody* is thus similar to an administrative decision to transfer an inmate from one prison to another; it can be said to involve no change in legal status. In contrast, where a federal detainer is lodged against a state prisoner, as here, the federal government formally invokes its sovereign prerogatives to demand a different status for a state prisoner. *See Braden v. 30th Judicial Dist., supra*. When such an alteration of status leads to significant adverse consequences, in the form of stigma and accompanying negative correctional classification, a liberty interest is impaired in a way substantially different from that present in *Moody*.

Finally, as a practical matter, the deprivation faced by Caruso falls more heavily upon him than the loss suffered by Moody. Moody, while on parole and after serving four of ten years on a previous rape sentence, was convicted again for killing two people. He offered no evidence to the Parole Board of mitigating circumstances. It thus seems unlikely that Moody would have been accorded privileges based on trustworthiness, regardless of the detainer. In distinction, Caruso, as his petition presents him, is a penitent drug addict whose second descent into criminality was prompted by the cravings of his affliction. His unrefuted claim that, but for the detainer, he would be eligible for drug rehabilitation programs offers considerable plausibility. And it certainly is not clear that his activities are such as to foreclose him from consideration for work-release. To construe *Moody* as barring relief in the case of Caruso is to analogize from a situation in which the inmate lost nothing but a formal right, to a case where a prisoner is stymied in his efforts at rehabilitation by the differences in practice between the two sovereigns to which he is subject. This is particularly troubling where such differences operate to prevent the very results that both authorities would approve: rehabilitation of a narcotics addict.

### D.

In view of the conclusion that taking the facts recited as true the detainer impinges upon a liberty interest, Caruso's *habeas corpus* petition is not a frivolous one and therefore not suitable for summary dismissal.

The government, however, disputes Caruso's allegation that he is precluded from participating in drug rehabilitation programs, and may also wish to introduce evidence regarding the other aspects of his petition. Moreover, the trial court has had no opportunity to evaluate, in the context of this case, what procedures would be required of the Parole Board in order to comport with due process. I would therefore reverse and remand for proceedings to address such issues.