Carl BUTLER, Petitioner,

v.

U.S. PAROLE COMMISSION, Respondent.

Civ. No. 82–0884.

United States District Court, M.D. Pennsylvania.

Feb. 3, 1983.

Carl Butler, pro se.

James West, Asst. U.S. Atty., Harrisburg, Pa., for respondent.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

The petitioner filed the instant petition for a writ of habeas corpus on July 22, 1982, setting forth nine different grounds to support his claim for relief. The petitioner challenges various aspects of the decision by the United States Parole Commission to revoke his parole and to continue him to a presumptive parole date after service of 36 months in custody. For the reasons set forth below, the court will deny the petition without conducting an evidentiary hearing.

## FACTUAL BACKGROUND

On October 6, 1972, the petitioner was given a ten-year sentence following his conviction for burglary in the District of Columbia Superior Court. This sentence was imposed under the aegis of the Narcotic Addict Rehabilitation Act, 18 U.S.C. § 4253, which provides that an addict convicted of a crime may be committed to the custody of the Attorney General for treatment of his drug addiction.

In June 1975, the petitioner was released on parole. Less than four months later, however, a parole violation warrant was issued against him. He was taken into custody in December 1975, and after a hear-

ing on February 20, 1976, his parole was revoked.

It appears that during the brief period he had been on parole, the petitioner committed a variety of offenses. In May 1976, he was sentenced to a nine-year term after a conviction in the District of Columbia Superior Court for petit and grand larceny. He subsequently received two one-year sentences from the United States District Court for the Eastern District of Virginia after being convicted of two counts of fraud. All of these sentences were to run consecutively to the petitioner's parole violation term. On November 29, 1979, the Bureau of Prisons properly aggregated these sentences, and concluded that the petitioner was serving a term in excess of seventeen years.

On September 5, 1980, however, the petitioner was again paroled. In addition to the usual conditions imposed upon parolees, the petitioner was ordered to comply with the condition that he "participate as instructed by [his] U.S. Probation Officer in a program approved by the U.S. Parole Commission for the treatment of narcotic addiction." *See* Respondent's Exhibit A, attached to Document No. 8A of the Record. In addition, the petitioner notes that he was to be given "Maximum Supervision" during his first six months of parole, *see* Exhibit A, attached to Petitioner's Memorandum, Document No. 2 of the Record. Although this condition regarding maximum supervision was included in the Commission's Notice of Action dated February 28, 1980, *see id.,* it was not included among the special conditions listed in the actual Certificate of Parole, dated September 5, 1980. *See* Respondent's Exhibit A, attached to Document No. 8A of the Record.

Although the petitioner was paroled on September 5, 1980, he was not enrolled in a drug treatment program until November 24, 1980. Pursuant to this program, known as "drug aftercare," the petitioner was to submit to urinalysis testing twice a week with a view toward determining whether he was engaged in illegal drug usage. Notably, the day after he had been enrolled in the program, the petitioner was tested, and it was determined that he already had reverted back to his use of narcotics. After a few more "positive" tests, and after many missed appointments for testing, the petitioner and his drug aftercare advisor agreed that his parole conditions should be modified to force the petitioner to reside in a "halfway house." *See* Respondent's Exhibit B, attached to Document No. 8A of the Record. On January 22, 1981, the petitioner and his advisor drafted a letter to obtain approval from the Commission for this modification of his release conditions. *See* Petitioner's Affidavit, Document No. 10 of the Record.

The petitioner asserts that by this time, he "was getting weaker and losing the battle in the fight against [his] drug usage." *See id.* He claims that he asked his drug aftercare advisor to contact the Commission's regional office to expedite his placement in the halfway house. Although the petitioner states that "[t]hese calls were to no avail," *see id.,* his placement in the halfway house was approved on February 9, 1981, and his parole conditions were modified accordingly.

The petitioner failed to appear at the halfway house, and his probation officer requested a warrant for his arrest. The probation officer stated:

> On 2–9–81 the Parole Commission informed me that the proposed modification [of petitioner's parole conditions] had been approved. However, [the petitioner] has not reported to either myself or his Aftercare counselor since 2–2–81. Numerous attempts to contact [the petitioner] have been unsuccessful including those made by [his] mother and girlfriend. I feel it is futile to reserve a bed [in the halfway house] for him any longer and find it necessary to request revocation of [his] parole and that a warrant be issued for his arrest on the . . . violations of release conditions.

*See* Letter to Michael J. Santella, Respondent's Exhibit D, attached to Document 8A of the Record. The probation officer then cited the three release conditions breached

by the petitioner. These violations included: (1) his illegal drug use, verified by urine testing, (2) his failure to comply with the drug aftercare program (*i.e.,* missed appointments) and (3) his failure to report to the halfway house. *Id.* A warrant application was filed on March 12, 1981, and a warrant was issued by the Commission for the petitioner's arrest. *See* Respondent's Exhibits E & H, attached to Document No. 8A of the Record.

On March 6, 1981, however, the petitioner had been arrested in the District of Columbia for petit larceny. *See* Petitioner's Affidavit, Document No. 10 of the Record. He also was charged with a violation of the Bail Reform Act because of his failure to appear in court in connection with the petit larceny charge. *Id.* He pled guilty to both offenses and was sentenced to two consecutive 120-day sentences by the District of Columbia Superior Court. *Id.*

On April 27, 1981, the Parole Commission was advised that the United States Marshals had located the petitioner in the District of Columbia jail on April 7, 1981, and that the warrant had been lodged as a detainer against him at that time. *See* Affidavit of Michael J. Santella, attached to Respondent's Response to Petition, Document No. 8A of the Record. On August 28, 1981, after receiving confirmation of the sentences imposed upon the petitioner by the District of Columbia court, the Commission prepared a supplemental warrant application to include the two convictions as parole violations. *Id.*

From the time that he learned of the detainer lodged against him, the petitioner began requesting a revocation hearing as well as a copy of the warrant application, so that he might prepare a defense to the charges. A representative of the Commission advised him by letter dated August 28, 1981 that he would be scheduled for a hearing after he had been placed in a federal institution. *See* Letter to Petitioner from Michael J. Santella, Respondent's Exhibit G, attached to Document No. 8A of the Record. Copies of the original warrant application and the supplemental application were enclosed with this letter. *See* Affidavit of Michael J. Santella, attached to Document No. 8A of the Record.

On September 28, 1981, after the petitioner had been released from the District of Columbia jail, a United States Marshal executed the warrant which had been lodged as a detainer. The petitioner was then placed in the Central Detention Facility in Washington, D.C. to await his designation to a federal prison. *See* Respondent's Exhibit H, attached to Document No. 8A of the Record. On November 6, 1981, the petitioner was transported to the United States Penitentiary at Lewisburg, Pennsylvania, and his revocation hearing was scheduled to take place at this institution.

On November 24, 1981, the petitioner mailed a letter to the Commission detailing certain favorable information he wished to be considered at his hearing. *See* Petitioner's Exhibit G, Document No. 7 of the Record. The Commission responded by advising the petitioner that the information contained in the letter would be considered. However, the Commission's response was dated December 11, 1981 and the revocation hearing had been held on December 7, 1981. *See* Petitioner's Affidavit, Document No. 10 of the Record. Nevertheless, the petitioner concedes that the hearing examiners had access to this letter, for he has stated that he presented the letter to them at the hearing. *Id.*

After the hearing, the petitioner was advised by Notice of Action dated January 5, 1982, that the Commission had decided to revoke his parole, forfeit the time spent on parole toward service of his sentence and to continue him for a presumptive parole after service of thirty-six months. *See* Respondent's Exhibit K, attached to Document No. 8A of the Record. The petitioner filed regional and national appeals, raising the grounds presented in the instant petition for habeas corpus relief. In both instances, the decision was affirmed, although there was a slight modification of the reasons for the action at the national level. *See* Exhibits D & E, attached to Petitioner's Memorandum, Document No. 2 of the Record.

The petitioner was advised of the outcome of his national appeal by a Notice of Action dated June 14, 1982. He filed the instant petition the following month.

## DISCUSSION

The petitioner supports his claim to habeas corpus relief by challenging nine acts and/or omissions of the Commission. These alleged errors concern the degree of supervision accorded to the petitioner while on parole, the procedures employed in revoking his parole, and the Commission's use of its guidelines in arriving at the petitioner's new presumptive release date. With respect to the Commission's use of its guidelines, the petitioner alleges a violation of the *ex post facto* clause of the Constitution. Alternatively, he argues that if there is no *ex post facto* violation, the Commission abused its discretion and violated his right to due process because of the manner in which the guidelines were applied and the reasoning employed in deciding to exceed the guidelines in his case.

## FAILURE TO SUPERVISE PETITIONER ADEQUATELY WHILE ON PAROLE

The first ground advanced by the petitioner to support his claim for habeas corpus relief is that the Commission conditioned his parole upon his participation in a drug addiction program, but then delayed placing him in the program until two months after his release. By the time he became exposed to the program, he asserts, he already had reverted back to his use of drugs. Hence, he argues, the delay was "a major contributing factor to [his] failure on parole," and if the Commission had fulfilled its "obligation to the petitioner and to society" he would not presently be incarcerated.

■ The government has no constitutional obligation to provide treatment for narcotics addiction. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Harris v. McRae,* 448 U.S. 297, 318, 100 S.Ct. 2671, 2688–2689, 65 L.Ed.2d 784 (1980); *Marshall v. United States,* 414 U.S. 417, 421–22, 94 S.Ct. 700, 703–704, 38

L.Ed.2d 618 (1974). Apparently recognizing this general rule, the petitioner relies upon the National Addict Rehabilitation Act, (N.A.R.A.), 18 U.S.C. § 4255 (1976), to demonstrate his "entitlement" to drug treatment. He argues that the Commission's delay in providing adequate treatment for his addiction amounts to a denial of due process and an equal protection violation. The petitioner's arguments must be rejected.

■ First, there is nothing in the petition which supports even a remote inference that the Commission violated the petitioner's right to equal protection of the laws. As to his due process claim, the petitioner's success, of course, depends upon the extent to which he is entitled to treatment under the N.A.R.A. In this regard, it is important to bear in mind that the petitioner does not allege that he was deprived of treatment. Rather, he alleges that the delay in placing him into a program deprived him of due process, and that this violation of his rights caused him to violate parole.

■ Neither the N.A.R.A. nor the statute under which the Commission gained its authority to condition parole upon participation in drug programs, 18 U.S.C. § 4209(c) (1976), expressly provides for a time period during which an addict must first be exposed to treatment. Accepting, *arguendo,* the petitioner's contention that he is entitled to treatment, the court simply cannot find any authority to support the notion that Congress intended to impose a timetable upon those charged with the responsibility for administering these programs. The "correct" method for treating addicts is scientifically unknown, and "the prospect for ... successful rehabilitation ... remains shrouded in uncertainty." *Marshall v. United States,* 414 U.S. at 426, 94 S.Ct. at 706. "When Congress undertakes to act in areas fraught with medical and scientific uncertainties, ... courts should be cautious not to rewrite legislation." *Id.* at 427, 94 S.Ct. at 706. Even if this court were to endorse the view that the petitioner should have been placed into a program immedi-

ately, it would be manifestly improper to impose this policy decision upon the Commission when Congress has not seen fit to do so.

 The petitioner's argument that he has "the vested right" to be "prevent[ed] ... from returning to the use of drugs" is untenable. In making these programs available to drug offenders and parolees, Congress did not intend to permit these individuals to shift the responsibility for their addiction to government agencies. On the contrary, Congress endorsed the view that "the addict must be ready to assume the responsibility for his own treatment and face the rewards of success and the punishment of failure." *See, e.g.,* H.R.Rep. No. 1486, 86th Cong., 2d Sess., *reprinted in* [1966] *U.S.Code Cong. & Adm.News* 4245, 4250 (footnote omitted). While the petitioner vigorously argues that the delay in treatment contributed to his return to the use of drugs, this, even if true, does not provide a ground for affording habeas relief. *Cf. Nevills v. Illinois,* 388 F.Supp. 622, 627 (E.D.Ill.1974) (mere delay in distributing unemployment benefits is not a "deprivation of property" within the meaning of due process clause).

## PROCEDURES EMPLOYED WITH RESPECT TO PETITIONER'S PAROLE VIOLATIONS

 As his second ground for habeas corpus relief, the petitioner contends that the Parole Commission violated his due process rights when it caused the detainer to be lodged against him on April 7, 1981 without providing a copy of the warrant application. However, petitioner was not entitled to notice of the issuance of the warrant until its execution. *Maslauskas v. U.S. Board of Parole,* 639 F.2d 935, 939 (3d Cir.1980). *Cf. Kenner v. Martin,* 648 F.2d 1080 (6th Cir.1981). The lodging of a detainer does not amount to "execution" of the warrant. A detainer is designed merely

to provide notice to the institution of confinement that a warrant has been issued and that the Commission intends to consider the question of parole revocation at a later date. *Moody v. Daggett,* 429 U.S. 78, 86, 97 S.Ct. 274, 278, 50 L.Ed.2d 236 (1976). "[T]he operative event triggering any loss of liberty attendant upon parole revocation" is the execution of the warrant and the concomitant assumption of custody of the parolee. *Id.* at 87, 97 S.Ct. at 279; *Morrissey v. Brewer,* 408 U.S. 471, 488, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484 (1972). Thus, the petitioner's "liberty interest" was generated on September 28, 1981, the date the warrant was executed. *See* Respondent's Exhibit H, attached to Document No. 8A of the Record. By this time, the petitioner already had been given notice of the charges underlying the warrant, for the Commission had sent him a copy of the warrant application on August 28, 1981. *See* Affidavit of Michael J. Santella, attached to Document No. 8A of the Record.

 The petitioner argues, however, that he was entitled to a copy of the warrant application at the time the detainer was lodged because the detainer itself instructs the prison official to whom it is addressed to deliver a copy to the prisoner. Moreover, there is a space provided on the detainer form for the prisoner to acknowledge that he received the copy.[1] *See* Petitioner's Exhibit A, attached to Petitioner's Affidavit, Document No. 10 of the Record; *see also* U.S. Parole Commission Rules and Procedures Manual, March 1, 1982 at § 2.46–01(b). Even if the petitioner could establish his entitlement to notice by relying upon the statements in the detainer form, he would also be required to demonstrate that he was prejudiced by the delay in receiving notice before he could obtain habeas corpus relief. *See, e.g., Franklin v. Fenton,* 642 F.2d 760, 764 (3d Cir.1980); *Maslauskas v. U.S. Board of Parole,* 639

1. The petitioner signed the acknowledgement under protest and was advised by a prison official that the warrant application "probably" would arrive later in the day. *See* Petitioner's Affidavit, Document No. 10 of the Record. He subsequently was told that "the detainer was all there was." *Id.*

F.2d at 938. As will be seen below, he cannot demonstrate such prejudice.

■ The petitioner claims that he lost certain documents and the names of various witnesses as a result of the delay in receiving a copy of the warrant application. *See* Petitioner's Exhibit G, Document No. 7 of the Record. This evidence, however, concerns mitigating circumstances. Although such evidence must be considered in connection with a formal revocation hearing, *see, e.g., Morrissey v. Brewer,* 408 U.S. at 488, 92 S.Ct. at 2603, this type of information is decidedly less important when the matter at issue is the lodging of a detainer. *See, e.g.,* H.R.Conf.Rep. No. 94–838, 94th Cong., 2d Sess. 35, *reprinted in* [1976] U.S.Code Cong. & Ad.News 335, 351, 367 (when reviewing warrants and detainers, the Commission is not required to hold a hearing "to determine the existence of mitigating circumstances."). *But cf. U.S. ex rel. Caruso v. U.S. Board of Parole,* 570 F.2d 1150, 1154 & n. 9 (3d Cir.1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978) ("[I]t may well be that a credible claim of 'substantial mitigating circumstances' imposes on the Parole Commission the obligation of holding an immediate ... hearing at which the parolee could preserve evidence" for the later revocation hearing.). Nevertheless, since the petitioner raises the same argument regarding prejudice in connection with his third ground for relief—that the Commission deprived him of a timely revocation hearing—the court will examine the facts presented in this case, to determine whether he was indeed prejudiced by the loss of favorable evidence.

The petitioner claims that various witnesses would have shown that there were extenuating factors regarding his parole violations. For example, he claims that one of the police officers present at the time of his arrest on the petit larceny charge would have provided insight into his mental state at the time of the offense. Other witnesses allegedly would have demonstrated that the petitioner tried desperately to fight his addiction, but was steadily losing the battle. The petitioner claims that the names and addresses of these individuals are now unavailable because of the Commission's alleged delay in providing a copy of the warrant application and convening the revocation hearing.

Although it appears that the hearing examiners may not have fully considered these claims of mitigating factors, *see* Petitioner's Exhibit I, attached to Petitioner's Affidavit, Document No. 10 of the Record, these matters were presented at both the Regional and Appellate levels of the Commission. The petitioner argued, *inter alia,* that extenuating circumstances justified a different disposition of his case. His arguments were rejected because none of the "information submitted for requested review was deemed significant enough to affect the decision." *See* Notice of Action on [Regional] Appeal, Exhibit D, attached to Petitioner's Memorandum, Document No. 2 of the Record. Since the petitioner presented his claims regarding mitigation, and it appears that they were considered, he was not prejudiced by the asserted loss of evidence. The Commission acted well within its discretion in rejecting the petitioner's claims that his parole violations were caused by his state of mind, and the court will not disturb its determination. *See, e.g., Steinberg v. Police Court,* 610 F.2d 449, 452–53 (6th Cir.1979); *U.S. ex rel. Caruso v. Board of Parole,* 570 F.2d at 1154 n. 8.[2]

## REPAROLE GUIDELINES AND THE EX POST FACTO CLAUSE

■ The next argument raised by the petitioner is based upon the *ex post facto* clause of the Constitution, *see* Art. I, § 9, cl. 3; *see also* Art. I, § 10, cl. 1, which forbids the imposition of punishment for an offense which was not punishable at the

**2.** Because the court finds that the petitioner is not entitled to habeas corpus relief in any event, it is unnecessary to address his claim that he was entitled to a revocation hearing within 120 days after the warrant had been lodged as a detainer. It is also unnecessary to address the Commission's contention that the successive petitions doctrine should be applied in the present case.

time it was committed. *See, e.g., Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 963–964, 67 L.Ed.2d 17 (1981). The clause also prohibits the government from augmenting punishment after the fact. *Id.* In order to fall within this constitutional prohibition, a penal law must have two characteristics: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Id.* at 29, 101 S.Ct. at 964; *United States v. Ferri,* 652 F.2d 325, 327–28 (3d Cir.1981).

The petitioner asserts that the Parole Commission violated the *ex post facto* clause by relying upon the guidelines in setting his presumptive release date. To support this argument, he urges that in 1972, the year he was originally sentenced, there were no guidelines, and the Commission (then the Parole Board) made its decisions by referring exclusively to a prisoner's institutional adjustment and prospects for rehabilitation. He argues that since the guidelines incorporate the factors of offense severity and parole prognosis, he has been "subjected ... to more onerous treatment" than he would have faced in 1972. *See* Petitioner's Memorandum at 11, Document No. 2 of the Record.

The court will reject the petitioner's assertion that such matters as offense severity and parole prognosis were not considered by the Parole Board in 1972 with respect to the question of reparoling individuals who had already violated parole. *See, e.g., Rifai v. United States Parole Commission,* 586 F.2d 695, 699 (9th Cir.1978) (offense severity is a consideration); *Caton v. Smith,* 486 F.2d 733, 735 (7th Cir.1973) (noting that parole prognosis was a "required" consideration); *Stubblefield v. Kennedy,* 328 F.2d 526, 528 (D.C.Cir.1964) (implicitly recognizing that offense severity would be a factor in determining length of incarceration after parole revocation); *United States v. Kenton,* 252 F.Supp. 344, 346 (D.Conn.1966) (under statute, Parole Board was required "to determine whether the violator is still a good parole risk;" parolee could try to "induce" the Board "to give him another chance"). *But cf.* Note, *Application of the Federal Parole Guidelines to Certain Prisoners: An Ex Post Facto Violation,* 62 *B.U. L.Rev.* 515, 515–16 (1982) (guidelines fail to incorporate post-sentencing factors like rehabilitation and institutional adjustment).

Nevertheless, the petitioner's challenge to the use of the parole guidelines in his case merits discussion. The Court of Appeals for the Third Circuit has held that "there is a potential violation of the *ex post facto* clause in the retrospective application of new guidelines promulgated by the United States Parole Commission when they are applied to prisoners who were sentenced prior to the enactment of the [Parole Commission and Reorganization Act (PCRA)] in 1976." *United States v. Ferri,* 652 F.2d at 327–28; *Geraghty v. United States Parole Commission,* 579 F.2d 238, 266–67 (3d Cir. 1978), *vacated on other grounds,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). The Third Circuit's position appears to conflict with the views expressed by a majority of other circuit courts. *Compare* 579 F.2d at 266–67 *with Warren v. United States Parole Commission,* 659 F.2d 183, 197 (D.C. Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *Zeidman v. United States Parole Commission,* 593 F.2d 806, 808 (7th Cir.1979); *Rafai v. United States Parole Commission,* 586 F.2d at 698–99; *Ruip v. United States,* 555 F.2d 1331, 1335–36 (6th Cir.1977). The Supreme Court, however, has twice declined to resolve the issue. *See United States Parole Commission v. Geraghty,* 445 U.S. 388, 390 n. 1, 100 S.Ct. 1202, 1205 n. 1, 63 L.Ed.2d 479 (1980); *United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239–2240, 60 L.Ed.2d 805 (1979); *see also Portley v. Grossman,* 450 U.S. 962, 101 S.Ct. 1476, 67 L.Ed.2d 611 (1981) (mem.). This court, of course, is bound by the views expressed by the Third Circuit in *Geraghty.*

In *Geraghty,* the prisoner attacking the Commission's guidelines had been sentenced pursuant to 18 U.S.C. § 4208(a)(2) (1970), and hence, was eligible for parole consideration immediately upon incarceration. *See* 579 F.2d at 262 n. 118. After applying the

newly-promulgated guidelines, the Commission determined that Geraghty would have to spend a certain number of months in prison before being paroled. *Id.* at 262. Geraghty attacked the Commission's guidelines as *ex post facto* legislation, contending that he was not given serious consideration for early release pursuant to § 4208(a)(2) because the Commission merely applied the "customary release date" as set forth by the guidelines. *Id.*

Writing for the *Geraghty* court, Judge Adams engaged in an exacting analysis, starting with the premise that a prisoner's right to "immediate" parole consideration under § 4208(a)(2) was a condition of his punishment which could not be altered to his disadvantage through retrospective legislation. *See id.* at 264–65. He noted that Geraghty's immediate eligibility for parole was, in reality, an inchoate opportunity to gain early release—an opportunity which could be brought to fruition only through a favorable exercise of the parole board's discretion. *See id.* at 263. Judge Adams observed that it was evident that the legislature could not obliterate this opportunity for discretionary release by retrospectively amending § 4208(a)(2) to condition his right to parole consideration upon the service of a certain number of months in prison. *Id.* at 266. He concluded that a mechanical application of the guidelines would have identical effect. Since the Commission would no longer be exercising its discretion, he reasoned, Geraghty effectively would be deprived of the opportunity for discretionary release. *See id.* ("[T]o maintain that the present parole guidelines enact no substantive limitation on parole eligibility may well be to misinterpret both the legal and practical effects of the guidelines."); *cf. United States v. Ferri,* 652 F.2d at 328 (mechanical application of guidelines may deprive a prisoner "of the opportunity to apply for discretionary release").

Under the *Geraghty* court's analysis, then, a prisoner can show that a retrospective application of the guidelines "disadvantages" him within the meaning of the *ex post facto* clause if he can demon-strate that he has been deprived of a meaningful exercise of the Commission's discretion through individualized consideration of his parole application. 579 F.2d at 267; *Crisp v. Wilkinson,* Civil No. 82–0032, slip op. at 3 (M.D.Pa., April 22, 1982); *Darby v. United States Parole Commission,* Civil No. 81–0609, slip op. at 8 (M.D.Pa., April 22, 1982); *Collins v. McCall,* Civil No. 81–1089 (M.D.Pa., Mar. 23, 1982). By the same token, however, if the prisoner has received individualized treatment, then he has not been disadvantaged by retrospective application of the guidelines, for he will not have been deprived of an exercise of the Commission's discretion and he will have been given the same *opportunity* for discretionary release that existed prior to the promulgation of the guidelines. *See, e.g., United States v. Ferri,* 652 F.2d at 328; *Crisp v. Wilkinson, supra,* slip op. at 3–4; *United States v. Tully,* 521 F.Supp. 331, 336–37 (D.N.J.1981).

Because the petitioner is challenging the Commission's decision in setting a new release date subsequent to revocation of his parole, he does not stand in the same situation as Geraghty and cannot rely upon § 4208(a)(2) to demonstrate his entitlement to "individualized consideration." Nevertheless, at the time that the petitioner originally was sentenced, parole violators were entitled to a form of "immediate parole eligibility" analogous to that involved in the *Geraghty* case. *See* 18 U.S.C. § 4207 (1970) (upon revocation of parole, "the prisoner may be required to serve all or any part of the remainder of the term for which he was sentenced"). The Parole Board was permitted to exercise a broad degree of discretion in determining the length of time, if any, that a parole violator was to remain incarcerated following the revocation of his parole. *See, e.g., McKinney v. Taylor,* 358 F.2d 689, 690 (10th Cir.1966). *See generally Warren v. United States Parole Commission,* 659 F.2d at 195–96. Thus, it is clear that the concerns outlined in *Geraghty* regarding the *ex post facto* clause apply with equal force in cases involving parole violators who complain of retrospective application of the reparole guidelines. *See gener-*

*ally Greenfield v. Scafati,* 277 F.Supp. 644, 646 (D.Mass.1967), *aff'd mem.,* 390 U.S. 713, 88 S.Ct. 1409, 20 L.Ed.2d 250 (1968). *But see Warren v. United States Parole Commission,* 659 F.2d at 194 (opining that the policies underlying the *ex post facto* clause are not implicated when a prisoner violates parole *after* promulgation of the guidelines).

█ After applying the *Geraghty* analysis in the present case, the court concludes that the petitioner has not been disadvantaged through a retrospective application of the reparole guidelines. The fact that the Commission rendered a decision "above the guidelines" in his case is, of course, persuasive evidence that the petitioner was not subjected to a "mechanical application" of these regulations. Indeed, under these circumstances, it is apparent that the petitioner actually would have been in a better position if the Commission had *not* exercised any discretion in his case and had decided instead to apply the guidelines mechanically. The court finds it unnecessary, however, to hold that a decision to depart from the guidelines vitiates a colorable *ex post facto* claim as a matter of law, for the record in this case clearly demonstrates that the petitioner was accorded "individualized consideration" by the Commission. For instance, the hearing examiners observed that the petitioner had "violated parole ... in an unusually rapid fashion, less than three months after [his] release, and after serving almost five years in custody for a prior parole violation." *See* Respondent's Exhibit J, attached to Document No. 8 of the Record. In addition, the examiners noted that the petitioner "impressed [them] as ... reasonably intelligent" but found that he had a "normally passive, dependent addict personality." *Id.* The hearing examiners also evaluated factors militating against continued incarceration of the petitioner. They considered the fact that he had a six-month old child, and that he had "a romantic attachment in the community." *Id.* They considered his explanations regarding his parole violations. For example, they observed that he had reverted back to his drug habit "because he lost his job and

because his father had throat cancer." *Id.* Given the fact that the Commission did much more than "mechanically" apply the guidelines in considering the petitioner's case, therefore, the court must reject his *ex post facto* claim.

### APPLICATION OF THE GUIDELINES

The next group of arguments raised by the petitioner in support of his claim for habeas relief concerns the manner in which the Commission applied the reparole guidelines. Unlike the petitioner's *ex post facto* claim, these contentions are founded upon the premise that the Commission exercised some form of discretion in applying, and then exceeding, the guidelines. In raising these arguments, the petitioner seeks to show that the Commission abused this discretion. The court recognizes that it is not empowered to substitute its own judgment for that of the Commission in evaluating the petitioner's claims. "Unless the Commission's exercise of its discretion represents an egregious departure from rational decision-making, its determination must stand." *Christie v. United States Parole Commission,* Civil No. 80–1451, slip op. at 5 (M.D.Pa., Sept. 14, 1981); *see Zannino v. Arnold,* 531 F.2d 687, 690–91 (3d Cir.1976).

█ The first issue raised by the petitioner regarding the use of the guidelines concerns the Commission's use of his two most recent convictions in determining his offense severity rating. The petitioner contends that the Commission may not consider these offenses because he has fully served the sentences imposed pursuant to these convictions. He argues that since the use of these convictions increases his offense severity rating—thereby pushing forward his presumptive release date—he is being punished again for these crimes despite the service of his sentences.

As both parties to this action observe, Judge Muir considered and rejected this practice in *Silberberg v. U.S. Parole Commission,* 483 F.Supp. 1280 (M.D.Pa.1980), stating:

Once a prisoner has served his term of incarceration, the Commission may not consider that crime in determining offense severity for another crime. It is irrelevant if upon expiration of the first sentence the petitioner is released from custody or is confined for the service of an additional sentence. In both situations the only sentence from which he can be paroled is the sentence that has not expired. It follows that in determining a parole date under the guidelines, the only relevant offense severity is the one applicable to that crime. Otherwise, the Commission is, in effect, holding a prisoner in custody beyond the term of imprisonment originally imposed.

*Id.* at 1283. Although the Commission argued that this practice was "authorized by statute and a long line of court decisions," Judge Muir carefully examined these authorities and found that they did not support the Commission's position. *Id.* at 1282. Therefore, having found that the Commission had "improperly utilized its guidelines," Judge Muir conditionally granted Silberberg's petition for a writ of habeas corpus. *Id.* at 1283. Significantly, the *Silberberg* case involved a construction of the Commission's guidelines; Judge Muir's holding did not depend upon any constitutional or federal statutory principles.

The petitioner's reliance on *Silberberg* is misplaced for in 1980 the Commission's guidelines were amended to provide the needed authority for considering expired sentences. *See Ronning v. United States,* 547 F.Supp. 301 (M.D.Pa.1982); 28 C.F.R. § 2.20, General Note E ("In cases where multiple sentences have been imposed . . . an offense severity rating shall be established to reflect the overall severity of the underlying criminal behavior. This rating shall apply whether or not any of the component sentences has expired."). More importantly, *Silberberg* did not involve parole revocation, so Judge Muir was not faced with the effect of 18 U.S.C. § 4214(d) upon his decision. This statute provides that before the Commission may take any action regarding a parole violation, whether it be revocation or a mere reprimand, it must

first consider "whether or not the parolee has been convicted of any Federal, State or local crime subsequent to his release on parole, and the seriousness thereof." 28 U.S.C. § 4214(d); *see* 28 C.F.R. § 2.21(b)(1)–(3). Since the Commission was permitted to consider his most recent offenses, the petitioner's argument on this issue. must be rejected.

The petitioner's next contention is that the Commission erroneously classified his offense behavior. He argues that the Commission should have treated his petit larceny offense as an administrative violation, *see* 28 C.F.R. § 2.21, rather than as a low severity offense. *See* 28 C.F.R. § 2.20. The petitioner's argument must be rejected. Although he has constructed an unusual argument that the guidelines contemplate a distinction between petit and grand larceny, his contention is not supported by the regulations. The guidelines state that *theft* is a low severity offense, absent aggravating factors. *See id.* The regulation does not expressly state that petit larceny should not be treated as "theft," and the court can find no reason for manufacturing such a distinction. The two cases cited by the petitioner to support his view deal with an immigration statute that clearly contemplates a distinction of this kind. *See Soetarto v. Immigration and Naturalization Service,* 516 F.2d 778, 779 n. 2 (7th Cir. 1975); *Giamarrio v. Hurney,* 311 F.2d 285, 286 (3d Cir.1962). These cases are, therefore, inapposite.

The petitioner also argues that the Commission erroneously classified his Bail Reform Act violation, which arose from his failure to appear in the District of Columbia court in connection with his petit larceny offense. The Notice of Action sent to the petitioner following his national appeal states:

[Y]ou were in violation of the Bail Reform Act, which is classified as escape without force or threat. . . . You were in violation for a period of 15 days. Guidelines established for this violation . . .

indicate a customary range of 6–12 months.

*See* Exhibit E, attached to Petitioner's Memorandum, Document No. 2 of the Record. The regulation at issue is 28 C.F.R. § 2.36(a)(2)(i)(A) (1981). The petitioner asserts that the Commission's Manual makes this provision inapplicable if the prisoner is "serving a federal sentence at the time of [the] offense." *See* U.S. Parole Commission Rules and Procedures Manual, March 1, 1982, Appendix 4 at III & M. The Commission responds to the petitioner's contention by noting that the "petitioner was not serving a federal sentence at the time of his bail reform act violation . . . but, rather, was subject to outstanding process" issued by the District of Columbia court. This court agrees with the Commission's position, for the petitioner does not allege that he was confined in *any* institution at the time he committed the offense. Clearly, the Commission classified the petitioner's failure to appear as an "escape" pursuant to its authority to characterize offenses not expressly contained within the guidelines by referring to analogous offenses listed in these regulations. *See* 28 C.F.R. § 2.20 Note B. It is apparent that the "federal sentence" exclusion contained in the Commission's Manual contemplates an escape from prison. The court cannot conclude that the Commission's failure to manufacture an analogous exclusion for a "failure to appear" represents an abuse of discretion.

The next issue raised by the petitioner concerns the Commission's citation of his prior parole violations to support its decision to "go above the guidelines" in his case. This ground for relief concerns the practice of "impermissible doubling," which has been considered many times in this district. *Stepek v. Chief Executive Officer, Allenwood Prison Camp,* Civ. No. 81–1463 (M.D. Pa., June 25, 1982); *see, e.g., Intersimone v. McCall,* Civ. No. 81–0741 (M.D.Pa., June 14, 1982). Pursuant to the "doubling proscription," the Commission "may not cite the same factors both for determining offense severity or salient factor score and for continuing his term beyond the guidelines."

*Stepek v. Chief Executive Officer, Allenwood Prison Camp,* slip op. at 2.

The petitioner's "doubling" argument is premised upon the fact that both of his parole violations were considered in arriving at his salient factor score. As to his first parole violation, he cites the Commission's use of "Item C" of the salient factor scoresheet. It provides:

Item C: Age at Current Offense/Prior Commitments.

Age at commencement of the current offense:

26 years of age or more . . . = 2 * * *
20–25 years of age . . . = 1 * * *
19 years of age or less . . . = 0

* * * Exception: If five or more prior commitments of more than thirty days . . ., place an 'x' here _____ and score this item = 0.

*See* 20 C.F.R. § 2.20 (1981). Prior parole violations resulting in the imposition of more than thirty days incarceration are treated as "prior commitments." *Id.* Thus, the petitioner's first parole violation was treated as a prior commitment pursuant to Item C. *See* U.S. Parole Commission Rules and Procedures Manual, March 1, 1982, Appendix 4 at VI §§ B.1 & C.4. Because the petitioner had five prior commitments, including the first parole violation, he fell within the exception appended to Item C and was given a zero score for this item. *See* Exhibit J, attached to Petitioner's Traverse, Document No. 9 of the Record. The petitioner argues, therefore, that as a result of this parole violation, he was not given the two points ordinarily given to one who has committed an offense after reaching the age of 26.

As to his most recent parole violation, the petitioner cites the Commission's use of "Item E" of the salient factor scoresheet. This item provides that an individual shall receive one point if he is "[n]either on probation, parole, confinement, or escape status at the time of the current offense." *See* 20 C.F.R. § 2.20 (1981). Because the petitioner's situation was otherwise, he was denied this point.

■ To be sure, the petitioner's two parole violations "caused" him to lose points on the salient factor scale. However, the loss of these points was not occasioned by the same aspect of parole prognosis that led the Commission to take him above the guidelines—and this is the decisive inquiry when impermissible doubling is at issue. The petitioner was taken above the guidelines because he had violated parole twice and had suffered rescission of his parole date twice. *See* Exhibit E, attached to Petitioner's Memorandum, Document No. 2 of the Record. The loss of points pursuant to Item C occurred because the petitioner had been incarcerated five separate times. The fact that one of the commitments to prison was caused by a parole violation does not support the petitioner's argument, for Item C clearly focuses upon an individual's exposure to prison, not the underlying behavior giving rise to the periods of incarceration.[3] The loss of a point pursuant to Item E occurred because he committed his current offense behavior while on parole. He would have lost this point whether or not he had ever violated parole before. *See Stepek v. Chief Executive Officer, Allenwood Prison Camp,* slip op. at 3 ("the loss of a point [pursuant to Item E] would occur whether a prisoner had violated parole/probation once or six times.") Since the Commission's decision to take the petitioner above the guidelines was premised upon his two prior failures to observe parole release conditions—an aspect of parole prognosis not covered by Item C or Item E—the Commission did not engage in impermissible doubling.

As his final ground for relief, the petitioner asserts that the Commission acted arbitrarily in taking him above the guidelines by eight months. Moreover, he argues that the Commission should have supplied an explanation of the method used to calculate the number of months that he was to remain confined beyond the guidelines. He contends that "[t]he Commission cannot arbitrarily reach a date or a number of months without reason to support that particular date or number of months." *See* Petitioner's Memorandum, at 10, Document No. 2 of the Record.

To support his argument that the Commission acted arbitrarily in exceeding the guidelines by eight months, the petitioner relies primarily upon Judge Rambo's opinion in *Davis v. U.S. Parole Commission,* Civ. No. 81–0503 (M.D.Pa., Aug. 28, 1981). In *Davis,* Judge Rambo observed that the factors justifying a decision to exceed the guidelines "[d]o not give the Commission a carte blanche to then set a parole date it is so disposed to select." *Id.,* slip op. at 4. Indeed, Judge Rambo reasoned, "[a]ny imposition of sentence, regardless of whether within or without the guidelines, must be founded upon fact and reason; to hold otherwise would permit ... arbitrary and prejudicial actions to go unchecked." *Id.* at 4–5.

The prisoner in *Davis* was assigned a "low moderate" offense severity rating and a salient factor score of "4." *Id.* at 5. According to the guidelines, then, Davis could expect to be incarcerated for a total of 12 to 16 months. *Id.* Finding that certain aggravating factors warranted a decision above the guidelines, however, the Commission determined that Davis would be confined until the expiration of his sentence. This effectively meant that he would serve 53 months in custody. *Id.* at 5–6.

---

**3.** Analogous support can be found for this proposition through reference to those cases which hold that the Commission may cite the *nature* of a prisoner's convictions as a reason for departing from the guidelines notwithstanding that the *number* of convictions is considered in computing the salient factor score. Under the reasoning of these cases, the Commission may look to the *nature* of these convictions in order to determine whether the prisoner has displayed a pattern of or propensity towards particular behavior. *See, e.g., Stroud v. United States Parole Commission,* 668 F.2d 843, 847 (5th Cir.1982); *Ronning v. United States,* 547 F.Supp. 301, 306 (M.D.Pa.1982). Applying the same reasoning to the present case, the Commission properly looked to the behavior underlying the petitioner's fifth commitment, *i.e.,* a parole violation, because this violation, when combined with his most recent one, demonstrated a pattern of failure on parole.

Judge Rambo noted that "the Commission could reasonably and rationally have exceeded the guidelines" under the facts in *Davis*. *Id.* She found it "inconceivable," however, that the Commission could justify such an extreme departure from the guidelines by stating merely that "a decision above the guidelines appears warranted." *Id.* Careful not to encroach upon the Commission's discretion in this area, Judge Rambo ordered that Davis' application for parole would have to be reconsidered in light of her holding that a legitimate departure from the guidelines is one that "*reasonably*" exceeds them. *Id.* at 6–7.

This court cannot say, as did Judge Rambo in *Davis*, that the degree to which the guidelines were exceeded demonstrates that the Commission "threw reason to the wind" in the present case. *See id.* at 6. According to the guidelines, the petitioner in the instant case could expect release on parole within 28 months. Deciding to exceed the guidelines, the Commission determined that he should be confined for 36 months. This decision to exceed the guidelines by eight months certainly appears more rational than the determination that the *Davis* prisoner should remain confined for more than three years above the guidelines. Moreover, the prisoner in *Davis* was assigned a salient factor score of 4, but was to remain in prison almost twice as long as a comparable prisoner with the worst possible score. In contrast, the instant petitioner *was* assigned the worst possible score—a zero—which indicated a dismal parole prognosis. The factors justifying a departure from the guidelines in this case, prior parole violations and rescissions of parole, certainly indicate that the Commission had a rational basis for deciding to order an additional eight months of confinement.

The court also concludes that the Commission is not required to supply an explanation as to how it determined that the petitioner should spend eight months more in prison than the guidelines indicate. In past cases, this court has held that an inmate is entitled to a meaningful statement of reasons after parole is denied. *See,*

*e.g., United States ex rel. Jacoby v. Arnold,* 442 F.Supp. 144, 147 (M.D.Pa.1977); *Soloway v. Weger,* 389 F.Supp. 409, 410–11 (M.D.Pa.1974). The petitioner was given a "meaningful statement" as to why the Commission exceeded the guidelines. As long as the Commission does not exceed the guidelines to a clearly irrational extent, *see Davis, supra,* it need not supply to prisoners or the courts the method used to determine the length of time a prisoner is to be confined before release on parole. A contrary holding would, in effect, require the promulgation of a *new* set of guidelines, to be used when the Commission decides to exceed the guidelines already being used. Such a rule would obliterate the Commission's discretion in these matters and would be inconsistent with the well-settled doctrine that the Commission's rationally-based decisions are not to be disturbed by the courts. *See, e.g., Zannino v. Arnold,* 531 F.2d at 690–91.

Since none of the grounds advanced by the petitioner afford a basis for habeas corpus relief, the court will deny his petition.

An appropriate Order will enter.