Louis OSTRER, Petitioner,

v.

Dennis LUTHER, Respondent.

Civ. No. B–83–236 (WWE).

United States District Court,
D. Connecticut.

April 28, 1987.

Louis C. Ostrer, pro se.

George Boylan, pro se.

J. Robert Cooper, Atlanta, Ga., M. Yvonne Gonzalez, Branford, Conn., Benson B. Weintraub, pro hac vice, Bierman, Sonnett, Shohat & Sale, P.A., Miami, Fla., for petitioner.

Thomas J. Riley, Asst. U.S. Atty., New Haven, Conn., for respondents.

### MEMORANDUM OF DECISION ON PETITION FOR WRIT OF HABEAS CORPUS

EGINTON, District Judge.

The petitioner is an inmate at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"). He brings this action for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2241. In *Ostrer v. Luther*, 615 F.Supp. 1568 (D.Conn.1985), the Court dismissed the instant petition for failure to exhaust administrative remedies. The Court has granted the petitioner's request to re-open this proceeding pursuant to Fed.R.Civ.P. 60(b). He claims that the decision of the U.S. Parole Commission to set his presumptive parole release date at nearly double the applicable guideline range is not rationally supported by the record. He seeks either a new parole hearing or immediate release from incarceration. For the reasons set forth below, the petition for a writ of habeas corpus is DENIED.

### I. Background

#### A.

On April 23, 1980, the petitioner was convicted in the U.S. District Court for the Southern District of New York of one count of conspiracy to evade payment of taxes, one count of income tax evasion, one

count of conspiracy to embezzle, two counts of embezzlement, one count of interstate transportation of stolen property, and one count of the use of money derived from a pattern of racketeering in violation of 18 U.S.C. Sec. 1962(a). On December 15, 1980, the Honorable Kevin T. Duffy sentenced him to a total regular adult term of 20 years on these counts. He began service of this 20 year sentence on February 23, 1981.

The presentence investigation report ("PSI") prepared in conjunction with this proceeding indicates that the trial focused on two separate patterns of criminal conduct: Mr. Ostrer's evasion of payment of over $6.8 million in federal income taxes, interest, and penalties; and, his embezzlement of over $1.2 million from a Teamsters' Union welfare and pension fund. The tax evasion offense involved an elaborate, fraudulent network in which Ostrer, aided by his wife and other business associates, established multiple bank accounts in New York and Florida. These accounts were held in the names of aliases, fictitious entities and dummy corporations and were designed to conceal the extent, sources, and location of Ostrer's assets. Although Ostrer voluntarily filed returns for tax years 1965–1975 in which he reported approximately $2 million in due taxes, he later stipulated in tax court to owing an additional $2 million. Interest and penalties automatically assessed for Ostrer's failure to pay on a timely basis brought the total due to approximately $6.8 million.

During Ostrer's trial, the Government also demonstrated that Ostrer, acting as a "consultant," persuaded trustees of a Teamster's local pension and welfare fund located in Brooklyn, New York, to invest over $2 million with Foundation Life Insurance Company of America. Ostrer directed the Teamsters to make payments, in the form of checks, to a fictitious entity which was to act as the Teamsters' investment agent. He obtained all the checks, deposited them into the account of a shell corporation, and then forwarded only part of the investment proceeds, keeping approximately $1.2 million for himself. In addition, Ostrer transported over $80,000 of the em-

bezzled funds across state lines in order to invest in a Florida corporation which he also controlled.

The New York PSI also sets forth details concerning the petitioner's criminal background. Ostrer claims that the New York PSI contains "erroneous, misleading, and patently false information" in its summary of his criminal background. The New York PSI states that the petitioner "possesses a criminal history dating to 1958 which is highly suggestive of questionable business practices." The petitioner claims that his criminal background is not nearly as extensive as this statement suggests. The PSI also states that, while subject to probation pursuant to a prior conviction, the petitioner "was re-indicted in the Southern District of New York on charges of stock manipulation, in concert with reputed organized crime figures." Ostrer claims that the characterization of him as a "financial advisor to the underworld" is without factual support.

B.

On June 18, 1982, the petitioner also was convicted in the U.S. District Court for the Southern District of Florida of one count of racketeering conspiracy in violation of 18 U.S.C. Sec. 1962(d). On September 14, 1982, the Honorable James W. Kehoe sentenced the petitioner to a seven year term of imprisonment. This term is to run concurrent with the 20 year term imposed in 1980 in the Southern District of New York. Accordingly, the Bureau of Prisons has determined that the petitioner is ineligible for parole until October 15, 1987, after service of 80 months, or one-third of his total twenty year sentence. *See* 18 U.S.C. Sec. 4205(a).

U.S. Probation Officer George S. Thompson, Jr. prepared another PSI in conjunction with the Florida conviction. The Florida PSI is more meticulously prepared than the New York PSI. On one occasion, Mr. Thompson explained his care in preparing this report by noting:

During my initial interview with Mr. Ostrer, it was learned that prior to sen-

tencing [on the 1980 New York convictions], the defendant had a limited opportunity to review the [New York PSI] for inaccuracies and it was further indicated that the [New York PSI] was not contested vigorously at that time due to the defendant's unawareness of the far reaching implications of certain inaccuracies in the presentence reports due to the consideration of the report for custody determination in prison as well as subsequent parole decisions. With that in mind, Mr. Ostrer provided this officer with a detailed affidavit concerning information in the original presentence report with which the defendant took exception. With the assistance of that document and other information provided by the defendant and his attorney, this officer conducted an independent investigation and prepared an independent second presentence investigation report to be utilized in U.S. District Court Case No. 81–230–Cr–JWK [Florida]. Thus, the defendant's institution file currently has two separate presentence investigations. It is important to note that the report prepared by this officer in the more recent case was designed to correct and update the original report. My sole consideration was to see that Mr. Ostrer would be judged, first for sentencing purposes and secondly for institution and parole purposes, in the most factual light possible.

Petitioner's Exhibit F (Memorandum attached to December 16, 1983 Letter from George Thompson to FCI Danbury Case Worker Hasson).

The Florida PSI summarizes the events supporting the petitioner's racketeering conspiracy conviction as follows: Ostrer conspired with a number of individuals to set up a complex scam in which officials from the Laborers International Union of North America, and other non-union co-conspirators, would receive kickbacks associated with the granting of union business. Individuals obtained kickbacks for helping to form health care and life insurance plans. These plans would eventually be available to all union members throughout the United States. Ostrer's participation in the scheme consisted of entry into an agreement between "Dental and Vision Care Centers," a corporation established in 1972 to funnel funds to union officials involved in the conspiracy, and "Sales Administrators for Employees Fringe Advantages, Inc.," a company run by Ostrer. Pursuant to the agreement, Ostrer's company was to verify the eligibility of union members for participation in the benefits program at a flat rate per member verfied. During the period of the contract, from September to December 1975, "Sales Administrators" received approximately $100,000 from "Dental and Vision Care Centers." Ostrer also received $75,000 through "Fringe Benefits, Inc.," another company which he operated. The petitioner and his codefendants received a total of approximately $2 million in kickbacks. Although the Government characterized Ostrer's role in the conspiracy as "simply to launder money," it nevertheless described his role as a "pertinent" one.

The Florida PSI also sets forth the results of Mr. Thompson's investigation into the petitioner's criminal background. The report indicates that Ostrer only has three prior felony convictions," the first occurring in 1967. Regarding the petitioner's business practices, Mr. Thompson notes that the petitioner has been employed in the insurance business since 1957. According to the report, the petitioner admits to maintaining "business acquaintances" with reputed organized crime figures, but only to the extent that he sold them special "Moral Risk Insurance Policies." In short, the Florida PSI sets forth the fruits of a rigorous investigation of the same prior offenses noted in the New York PSI. However, the impression left by Mr. Thompson's report is that Mr. Ostrer's criminal background, while extensive and serious, may not date as far back as the New York PSI suggests.

### C.

The instant action was originally commenced in December, 1981, in the U.S. District Court for the District of Columbia. On March 7, 1983, the court entered an order transferring the case to the District of Connecticut, where the petitioner filed an amended complaint. In response, the Government filed a motion to dismiss the

petition, which the Court granted. *See Ostrer v. Luther*, 615 F.Supp. at 1568.

In the amended petition, the petitioner claimed that the Bureau of Prisons had designated him a Central Monitoring Inmate case, and on that basis, had denied him furloughs. He alleged that this classification resulted from allegedly false information contained in the New York PSI. As of August, 1985, the petitioner had refused his initial parole hearing. *Id.* at 1570. Nevertheless, Ostrer asked this Court to effectively expunge the challenged information from the New York PSI. The Court dismissed the petition for failure to exhaust administrative remedies. Because the Parole Commission is obliged to consider both the New York and the Florida PSIs in light of the petitioner's objections, and to resolve any material dispute "by a preponderance of the evidence," the Court decided that a petitioner must first present claims concerning the accuracy of a PSI to the Parole Commission. *See* 28 C.F.R. Sec. 2.19.

Although it declined to address the merits of the petitioner's claim, the Court observed:

> The two PSIs have substantial differences.... Perhaps the most important of these are the statements of the New York report that Ostrer maintained "a relationship with various reputed organized crime figures," and that he was "a financial advisor to the underworld." ... Plaintiff claims that this information is false. The Florida report contains no such statements. Both PSIs are on file with the Commission.

615 F.Supp. at 1570.

The Court further noted:

> After considering Plaintiff's claims, the Commission and the appeals board can decide not to rely on the disputed PSI. Such a decision would ensure that the challenged PSI played no part in Ostrer's parole determinations. Thus the object of this action would be achieved.

*Id.* at 1573.

### D.

At FCI Danbury on December 19, 1985, the Parole Commission held an initial hearing to determine the petitioner's eligibility for parole pursuant to his New York and Florida convictions. The examiner panel, which consisted of Mr. Alex and Mr. Kruger, determined that the petitioner's salient factor score ("SFS") should be set at "6," in part, because the number of petitioner's prior convictions. It further recommended that the petitioner's offense severity rating ("OSR") should be set at Category Six because the monetary value of his offense behavior exceeded $500,000. *See* Pinner Declaration, Exhibits 1 and 2 ("Decl. Exh.") The panel established the petitioner's presumptive parole release guidelines as 52–64 months. *See* 28 C.F.R. Sec. 2.20. In rendering its recommendation to incarcerate Ostrer beyond the time suggested by the guidelines, the panel stated:

> This 63 year old offender has now served almost 5 years on a 20 year regular adult term. He is also serving a concurrent 7 year term, which he is actually out on bail on but none the less his sentence is tolling. His two present convictions are indeed large scale, on going and sophisticated frauds. They come on the heels of two other fraud convictions, one on the state level and one on the federal. Mr. Ostrer appears to lack the ability to learn from his experiences, i.e., he has been previously prosecuted and convicted but continues in his malfeasant schemes. [sic]

> As indicated, the panel is in no way basing its descision [sic] on the organized crime allegations in this case. Rather, the panel believes that the subject should serve considerable time, in that all of his fraudulent behavior aggregated to hundreds of thousands of dollars and probably results only from tens of thousands of dollars of government funds spent in investigating, prosecuting, and incarcerating him. The panel's recommendation is some 30 months above the eligibility date in this case and it is approximately twice over the guidelines.

The panel seriously considered recommending original jurisdiction in this case but decided against it, in view of the

panel's belief that the organized crime allegations are not sufficient in which to make a finding. However, the Regional Commissioner may still wish to consider original jurisdiction processing in this case.

Decl. Exh. 2 at 3–4. Accordingly, the examiner panel recommended that the petitioner be continued for presumptive parole release after service of 110 months.

Upon review, the Regional Commissioner agreed with the examiner panel's recommendation, thus making it the effective decision of the Commission. 28 C.F.R. Sec. 2.23. In affirming the decision, he stated:

After review of all relevant factors and information presented, a decision above the guidelines appears warranted because you are a more serious risk than indicated by your salient factor score in that the present two convictions which center out of two different federal districts, are your third and fourth convictions for large scale, on going and sophisticated fraud.

Decl. Exh. 3. The petitioner was advised of this decision on February 4, 1986. He filed an administrative appeal of this decision to the National Appeals Board. On May 8, 1986, the National Appeals Board affirmed the 110 month parole release date. In affirming the Regional Commissioner, the National Appeals Board cited the following modified reasons:

Your offense behavior has been rated as Category Six severity because it involved tax evasion, fraud, embezzlement and a racketeering conspiracy, exceeding $500,-000. Your salient factor score is 6. You have been in federal custody for a total of 62 months. Guidelines established by the Commission for cases which consider the above factors indicate a guideline range of 52–64 months to be served before release for cases with good institutional adjustment and program achievement. After review of all relevant factors and information presented, a decision above the guidelines appears warranted because you are a more serious risk than indicated by your salient factor score due to your history of repetitive

sophisticated criminal behavior: You have two prior convictions for sophisticated fraudulent behavior; a 1967 offense which involved over $300,000, and a 1970 offense which involved stock-rigging fraud, and the instant offenses [which] involved sophisticated frauds.

Decl. Exh. 5 at 1. The petitioner will be scheduled for a statutory interim hearing in December, 1987, after which the Commission will determine whether a different decision is warranted. *See* 28 C.F.R. Sec. 2.14(a).

## II. Questions Presented

As the instant petition demonstrates, one does not always find fire where there is smoke. On its face, this petition alleges near shocking misconduct on the part of Commission officials. Upon closer inspection, however, one finds that the smoke is not the product of a fire fueled by the arbitrary actions of the Commission, but is rather a cloud which is the result of a petitioner who has vigorously stirred cold ashes.

The petitioner apparently does not contest the Commission's determination of his SFS and OSR. However, he presents a list of allegations which, in effect, amount to a claim that the Commission has abused its discretion by rendering a presumptive parole release date which is double the applicable guideline range. He claims, *inter alia,* that: (1) The Commission failed to make sufficient findings of fact as required by 28 C.F.R. Sec. 2.19(c); (2) The Commission relied on materially false information in rendering its decision; (3) A decision above the guidelines is not supported by the record as required by 18 U.S.C. Sec. 4206(c); (4) The Commission engaged in impermissible "double counting"; (5) The National Appeals Board unlawfully delegated its authority to review the petitioner's case to Commission staff members; (6) The Commission failed to follow correct procedures in deciding his presumptive parole release date; (7) The examiner panel displayed a result-oriented predisposition when it reviewed the petitioner's case; and, (8) The Commission improperly considered the petitioner's recent Nevada indictment

as evidence of criminal wrong-doing without establishing a proper factual basis. Petition at para. 20 *et. seq.* Each of these claims is without merit.

### III. Discussion

### A. Commission's Use of PSIs

The petitioner's first three claims relate to the Commission's alleged improper reliance on the New York PSI instead of the "more accurate" Florida PSI. The gravamen of his complaint is that the New York PSI contains erroneous and misleading information with respect to his criminal history and his associations with reputed members of organized crime. Petitioner's Memorandum of Law ("Pet. Mem.") at 7. He claims that, by considering the New York PSI, the Commission deprived him of due process.

A federal court's review of Commission decisions is limited to whether the Commission has abused its discretion. *Lieberman v. Gunnell,* 726 F.2d 75, 77 (2d Cir.1984); *Bialkin v. Baer,* 719 F.2d 590 (2d Cir.1983). The Commission has broad discretion in assessing the credibility of any relevant information before it. *Cerullo v. Gunnell,* 586 F.Supp. 211, 215 (D.Conn.1983); *Iuteri v. Nardoza,* 560 F.Supp. 745, 755 (D.Conn. 1983), *aff'd,* 732 F.2d 32 (2d Cir.1984). The Court may not substitute its own judgment for that of the Commission, but it may only consider whether there is a rational basis for the decision. *Bialkin,* 719 F.2d at 593. In the instant case, the record rationally supports the Commission's determination of the petitioner's presumptive parole release date.

█ The Commission is expressly directed by statute to consider PSIs. 18 U.S.C. Sec. 4207(3). Therefore, it properly considered both the New York PSI and the Florida PSI. Nevertheless, the petitioner construes this fact, together with the Court's prior recognition that the two PSIs contain "substantial differences," to support his claim that the Commission's decision is arbitrary and capricious. He provides an elaborate comparison of the two PSIs in order to demonstrate that the New York PSI is fatally inaccurate and should

not form the basis for any Commission decision. Having read both PSIs in light of the Commission's ultimate decision and the stated reasons therefor, the Court finds any patent differences between the two reports are irrelevant.

Although the two PSIs differ in several respects, any differences which could be considered "substantial" are either: (1) not necessarily false, or (2) were not relied upon by the Commission. The New York PSI is admittedly a less detailed document than is the Florida PSI. Some of its characterizations of events seem conclusory and are probably not entitled to unquestioned deference. The basic problem with the New York PSI is that, when compared to the Florida PSI, it seems to omit, rather than affirmatively misstate, some facts. However, the only arguably "material" and "false" observation which the New York PSI contains concerns the petitioner's reputed connections with organized crime. Yet, the Commission expressly refused to base its determination on this fragment of information. Likewise, the question of whether Ostrer's "criminal history" dates to the 1950's was not a factor in the Commission's final decision. Its determination is based upon the nature and circumstances surrounding the petitioner's four admitted felony convictions. Accordingly, the Court declines Mr. Ostrer's apparent invitation to conduct an evidentiary hearing and, in effect, retry him on aspects of his criminal history which have had no apparent effect on the Commission's decision.

The petitioner claims that the Parole Commission failed to make "findings" supported by a preponderance of the evidence as required by 28 C.F.R. Sec. 2.19(c). Actually, the petitioner's dissatisfaction is grounded in the Commission's explicit refusal to declare one PSI more accurate than the other. It is true that the Court has stated that the Commission has a primary duty to resolve disputes concerning the accuracy of these reports by using the "preponderance of the evidence standard." *Ostrer v. Luther,* 615 F.Supp. at 1572. However, the petitioner has apparently forgotten that the Court also stated that the

Commission could meet its obligation to consider information which is accurate by a preponderance of the evidence by deciding not to rely on the disputed information. *Id.* at 1573. In effect, this is what the Commission did. The Commission's determination reflects a consideration of material which consistently appears in both presentence reports. At this point, the Court need not decide whether every statement in the New York PSI is correct; only facts which constitute significant factors in the Commission's decision are subject to the Court's review. *Solomon v. Elsea,* 676 F.2d 282, 289 (7th Cir.1982). The petitioner is not entitled to have the Commission, or the Court, make further "findings of fact."

"[O]n judicial review the question 'is not whether the [Commission] is supported by the preponderance of the evidence or even by substantial evidence; the inquiry is whether there is a rational basis in the record for [its] conclusions embodied in its statement of reasons'." *Myrick v. Gunnell,* 563 F.Supp. 51, 54 (D.Conn.1983) (quoting *Zannino v. Arnold,* 531 F.2d 687, 691 (3d Cir.1976)). The undisputed aspects of Ostrer's criminal background support the Commission's findings that he has been involved in criminal conduct of considerable magnitude and sophistication. The petitioner hypothesizes that, since the examiner panel asked about his organized crime connections, this information, as presented in the New York PSI, must have supplied an undisclosed basis for the decision. *See* Pet.Mem. at 13–14. The Court cannot accept the petitioner's "invit[ation] to proceed upon the basis of his strained and speculative scenario and on this ground to second guess the Commission's decision." *Iuteri v. Nardoza,* 732 F.2d 32, 37 (2d Cir.1984). A decision which is patently rational is presumptively valid.

■ The Commission's statement of reasons for its action, while brief, sufficiently apprises the petitioner of the reasons for its decision.

To satisfy minimum due process requirements a statement of reasons should be sufficient to enable a reviewing body to determine whether parole has been de-

nied for an impermissible reason or for no reason at all. For this essential purpose, detailed findings of fact are not required, provided the [Commission's] decision is based upon consideration of all relevant factors and it furnishes to the inmate both the grounds for the decision ... and the essential facts upon which the [Commission's] inferences are based....

*United States ex rel. Johnson v. Chairman of New York State Board of Parole,* 500 F.2d 925, 934 (2d Cir.), *vacated as moot,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974); *accord Kilpatrick v. Luther,* Civil No. B–86–611, Ruling and Order, (D.Conn. December 12, 1986) (Daly, C.J.); *Hodges v. O'Brien,* 589 F.Supp. 1225, 1231 (D.Kan.1984); *Simpson v. Gunnell,* 567 F.Supp. 20, 26–27 (D.Conn.1982). The examiner panel, Regional Commissioner, and National Appeals Board all informed the petitioner that the sophisticated and repetitive nature of his crimes, coupled with their magnitude, provided the basis for the Commission's decision. This explanation sufficiently apprises the petitioner of the reason for the Commission's actions and may not be challenged. *Baker v. McCall,* 543 F.Supp. 498, 500 (S.D.N.Y. 1981), *aff'd mem.,* 697 F.2d 287 (2d Cir. 1982).

## B. *Double Counting*

The petitioner erroneously construes the fact that the Commission set his parole release date at "more than double the minimum guideline range" as a violation of the prohibition against "double counting." The Commission's determination does not constitute double counting and is not so irrational as to demand redetermination of the petitioner's presumptive parole release date. *Cf. Alessi v. Thomas,* 620 F.Supp. 589, 594 (S.D.N.Y.1985).

■ The Commission may grant or deny release on parole notwithstanding the guidelines if it determines that there is "good cause" for so doing. 18 U.S.C. Sec. 4206(a). Properly considered "aggravating factors" which rationally support a decision above the guidelines include the nature,

frequency and similarity of offenses, as well as the proximity of the current offense to prior offenses. *Bialkin,* 719 F.2d. at 594; *Wiggins v. Nelson,* 510 F.Supp. 666, 668 (D.Conn.1981). "[I]t [also] is clear that Congress wanted the Commission to have the authority to confine prisoners beyond the established guidelines when it concludes that a prisoner has been involved in an offense involving an unusual degree of sophistication." *Alessi v. Quinlan,* 711 F.2d 497, 500 (2d Cir.1983); *accord Zannino v. Arnold,* 531 F.2d at 691 ("large-scale conspiracy" committed in "unusually sophisticated manner"); *Baker v. McCall,* 543 F.Supp. at 500 ("unusual sophistication," duration of conspiracy, and evidence that petitioner was "chief" sufficient to render decision outside guidelines). Likewise, the magnitude of an inmate's crime constitutes "good cause" for rendering a decision above guidelines. *See Solomon v. Elsea,* 676 F.2d at 287 (hashish involved surpassed guidelines by well over 1000 lbs); *see also United States v. Perry,* 643 F.2d 38 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981) (One who aids and abets is as responsible as if he committed the crime directly.) Thus, "the Commission may cite the *nature* of a prisoner's convictions as a reason for departing from the guidelines notwithstanding that the *number* of convictions is considered in computing the salient factor score." *Butler v. U.S. Parole Commission,* 570 F.Supp. 67, 80 n. 3 (M.D.Pa.1983) (emphasis in original).

█ The Commission determined that a decision above the guidelines was warranted because the petitioner is a more serious parole risk than is indicated by is SFS. As the Commission has already explained:

> The salient factor score accounts for the number of prior convictions, but does not reflect the nature of the prior convictions. The decision to go above the guidelines in your case reflects the seriousness, sophistication and repetitiveness of your criminal behavior in that the current offenses represent your third and fourth convictions for fraud of unusual magnitude and/or sophistication.

Decl. Exh. 5 at 1. This explanation is in accord with this Court's interpretation of applicable regulations. *See, e.g., Brach v. Nelson,* 472 F.Supp. 569, 570 (D.Conn. 1979).

Admittedly, the petitioner has engaged in a series of elaborate frauds involving millions of dollars. The excessive magnitude of his offenses is not reflected in the parole guideline computation. Thus, the Commission, in rendering a decision above the guidelines, is properly indicating that the petitioner's conduct was far more egregious than what was reflected in the SFS. *Golden v. Baer,* Civil No. B–85–16, slip op. at 6 (D.Conn. November 8, 1985) (Burns, J.) [Available on WESTLAW, DCT database]. Under the parole guidelines, the petitioner needed only to have participated in criminal conduct involving more than $500,000 to warrant a Category Six rating. *See* 28 C.F.R. Sec. 2.20, Chapter Five, subchapter A, section 501(a) and Chapter Three, subchapter D, section 331(a). This is the highest severity category applicable to the petitioner under current regulations. However, the petitioner played important roles in offenses involving $6.8 million (tax evasion), $1.2 million (embezzlement), and $2 million (racketeering conspiracy). It is rational to conclude that a person involved in a course of criminal conduct involving almost $10 million should be confined longer than someone whose crime involved $500,-000. *See Alessi v. Quinlan,* 711 F.2d at 500.

The petitioner claims that the Commission failed to consider relevant favorable information or to afford it any weight. The Commission is accorded substantial deference when performing its duty to weigh and evaluate evidence. *Graham v. Luther,* Civil No. B–86–378, slip op. at 10 (D.Conn. October 14, 1986) (Daly, C.J.); *Richards v. Crawford,* 437 F.Supp. 453, 455 (D.Conn.1977). The record, which includes two audio tapes of the petitioner's initial parole hearing, indicates that both Ostrer and his attorney were afforded ample opportunity to present favorable information to the examiner panel. Ostrer presented his thoughts on his offenses, as well as evidence of his excellent institution-

al adjustment. Ostrer's counsel presented documentary evidence to the examiners and argued on his client's behalf. *See* Pet. Mem. at 20. Where information is presented to the Commission, and its final decision is not arbitrary and capricious, the Court will not presume that it ignored favorable information. *See Nunez-Guardado v. Hadden,* 722 F.2d 618, 621 (10th Cir.1983); *Baker v. McCall,* 543 F.Supp. at 501.

Curiously, the petitioner maintains that the Commission denied him the "right to be confronted with and respond to aggravating factors cited by the Commission (for the first time on appeal) in setting a release date above the appropriate guideline range." Pet.Mem. at 27. Aggravating circumstances may be taken into account provided the inmate is apprised of the information to be considered and given an opportunity to respond. *Patterson v. Gunnell,* 753 F.2d 253, 255 (2d Cir.1985); 28 C.F.R. Sec. 2.19(c). The petitioner's own preparation for the parole hearing makes an argument based upon lack of notice sound ridiculous. The petitioner, represented by counsel, prepared extensively for the hearing. *See, e.g.,* Decl. Exh. 2 at 1 (panel reviewed taped interview brought by petitioner's attorney). Long before December 19, 1985, the petitioner himself ensured that his initial parole hearing would substantially involve the New York and Florida PSIs. *See Ostrer v. Luther,* 615 F.Supp. at 1568 (decision rendered on August 30, 1985). A prehearing assessment report was prepared on April 5, 1985, some 8 months before his December 19, 1985 hearing. This prehearing assessment summarized factors which the Commission considered important in establishing the petitioner's applicable guideline range. The tape of the initial hearing indicates that the petitioner was well-prepared to address the issues raised at the proceeding. *Cf. Zurica v. U.S. Parole Commission,* 668 F.Supp. 107, 110 (D.Conn.1986) (Burns, J.) (Tape which shows that the petitioner presented arguments indicates he received procedural protections.)

The petitioner objects to the fact that the National Appeals Board "modified" the reasons for the Commission's decision, thus depriving him of his ability to respond. When the National Appeals Board relies on aggravating circumstances which are applied to an inmate for the first time on appeal, the prisoner may be deprived of his "opportunity to respond." *Patterson v. Gunnell,* 753 F.2d at 255. However, the National Appeals Board did not apply new aggravating circumstances to the petitioner for the first time on appeal. Though labeled a "modification," the Notice of Action on Appeal only sets forth with greater clarity the same reasons relied upon by the examiner panel and Regional Commissioner. It does not include new or different reasons for the Commission's decision. The Board's use of the word "modified" is not a talisman which transforms the Commission's final, clarified statement into a decision which violates due process.

Basically, the petitioner's "double counting" argument is premised on the fact that his guideline range is 52–64 months, and his presumptive release date is 110 months, nearly double the applicable guideline. First, as already explained, this 110 month release date would only be arbitrary if it could not be rationally imposed based upon the instant record. Second, the excessiveness of this determination is diminished by the fact that, even under the most favorable circumstances, the petitioner is not eligible for parole until service of 80 months. Finally, this doubling of the applicable guideline range bears a rational relationship to the fact that Ostrer is presently serving concurrent sentences for *two* extremely large-scale courses of criminal conduct.

### C. Procedural Irregularities

The petitioner alleges that Commission officials failed to follow proper procedures and displayed a "result-oriented predisposition toward an adverse parole decision." *See* Pet.Mem. at 30–39. Because administrative decisionmakers are afforded a presumption of honesty and integrity, unsubstantiated allegations of bias or misconduct are insufficient to state a claim

upon which relief can be granted. *Sacco v. U.S. Parole Commission,* 639 F.2d 441, 443 (8th Cir.1981). A litigant must set forth facts which support his allegation that the decision-maker could not render an impartial judgment. *See Berger v. U.S.,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921).

■ The petitioner claims that, on the morning of his initial parole hearing, Hearing Examiner Alex "assured OSTRER, 'with a wink,' that he would receive a fair hearing with due consideration given to all of OSTRER's concerns." The petitioner construes this cordiality as a "false assurance of receiving favorable parole consideration [thus leading] him down the primrose path." Pet.Mem. at 33. The tapes of the proceeding indicate that the hearing examiners knew Mr. Ostrer after having met him on other occasions. Examiner Alex noted that Mr. Ostrer has a good rapport both with prison officials and his fellow inmates. The examiners apparently were interested in addressing the petitioner's concerns. For example, Mr. Alex agreed with Ostrer's contention that his criminal career should not be considered as beginning in 1958, as is suggested in the New York PSI. Alex accepted the Florida PSI's version of the 1958 incident, which indicated that a forged check charge was withdrawn. Tape 1, Side 2. However, Mr. Alex specifically told Mr. Ostrer at the outset that he would "not judge him easily, but [that he] was not going to judge him on organized crime" because his status as a "financial consultant had not been proven to [his] satisfaction." *Id.* The Court refuses to infer bias from polite words and frank speech. It finds no evidence that the examiner panel misled the petitioner or that it displayed impermissible bias toward him. *Cf. Rastelli v. Warden,* 622 F.Supp. 1387, 1394–95 (S.D.N.Y.1985) (Inaudible tape and transcript leaves court with "firm conviction" that hearing examiner was not objective).

■ At the beginning of the December 19 hearing, Mr. Alex stated for the record that he had taken Ostrer's extensive file to his motel the night before and had spent approximately 2½ hours thoroughly reviewing it. Decl. Exh. 2 at 1. The petitioner contends that this review, coupled with the fact that Alex spoke to him outside the hearing room "on numerous occasions," constitutes a violation of Commission procedures.

For support, the petitioner cites *United States Parole Commission Rules and Procedures Manual,* (11/4/85) at Sections 2.22–06 and 2.22–07. Section 2.22–06 states:

> *Visits of Federal Prisoners to Commission Offices.* The Commission's Regional Offices and its Headquarters Office shall not discuss a case with a Federal prisoner except at a duly scheduled hearing. Parolees or mandatory releasees who come to the Commission's offices shall be informed that they must instead contact their probations officer. Persons in the community under the legal custody of the Bureau of Prisons shall be informed that they must instead contact their caseworker.

Section 2.22–07 states:

> *Contacts at Institutions.* Examiners should be careful not to be swayed in their deliberations by comments by any institutional official, unless such comments are substantiated by data in the prisoner's file or made during the course of the hearing with the prisoner present. Persons making gratuitous comments to the examiners should be invited to present their thoughts in writing and make them a part of the record. Examiners should not engage in conversations outside the hearing room concerning any prisoner with any member of the public, attorney, or relative of an inmate who might be in the vicinity of an institution or who might attempt to influence an examiner at any place or at any time.

■ As an initial observation, it seems that neither of these sections prohibit any of the hearing examiner's alleged improper actions. It would be ludicrous to construe these sections as prohibiting any conversation between examiners and an inmate unless such conversation is held in the context of "a duly scheduled hearing."

In addition, these sections do not prohibit an examiner from reviewing an inmate's file prior to a hearing. Common sense suggests that hearing examiners should take adequate time to review a file before rendering a recommended parole decision. Finally, the *Parole Commission Rules and Procedures Manual* does not create, in and of itself, any due process rights in an inmate. *Lynch v. U.S. Parole Commission,* 768 F.2d 491, 497 (2d Cir.1985). Even assuming that the examiner panel violated Commission policy by speaking with the petitioner outside of the hearing room or by reviewing his file in a hotel room, such a deviation does not implicate a violation of a protected right.

 Prior to his initial parole hearing, the petitioner had been indicted in Nevada for mail fraud. The hearing examiners asked him if he could "tell [them] anything about it?" After Ostrer briefly commented on the indictment, Examiner Kruger stated that the panel would not consider the Nevada indictment because there were no facts available to support a finding of guilt on the charge by a preponderance of the evidence. Tape 2, Side 1. The Second Circuit has consistently held that the Parole Commission may consider unadjudicated charges, charges in dismissed counts of an indictment, or evidence of crimes of which the accused has been acquitted. *See, e.g., Billiteri v. U.S. Board of Parole,* 541 F.2d 938, 944 (2d Cir.1976). Nevertheless, the record contains no evidence which indicates that the panel considered the Nevada indictment in its deliberations, or that this new indictment provided a basis for the Commission's final decision. *Cf. Taylor v. U.S. Parole Commission,* 734 F.2d 1152 (6th Cir.1984) (Commission cannot rely on single piece of hearsay evidence to establish parolee engaged in new criminal conduct.)

The petitioner's final claim against the examiner panel is vague and concerns Mr. Kruger. Ostrer notes that, even though his initial hearing took almost two hours, the panel, which consisted of Mr. Alex and Mr. Kruger, only deliberated for 8 minutes. Only Mr. Alex reviewed Ostrer's file in his hotel room. From this, the petitioner concludes "that Mr. Kruger was predisposed toward an adverse parole decision in this case." Pet.Mem. at 35.

 Hearing examiners are charged with making a determination of whether a particular inmate is a good or poor parole risk. *See* 28 C.F.R. Sec. 2.13. The Court assumes that most hearing examiners are familiar with relevant regulations. They routinely are asked to evaluate facts and then render an opinion on one specific issue: parole eligibility. Here, one examiner took the time to digest the petitioner's voluminous file. Both examiners took almost two hours to explore the facts relevant to the decision they were required to make. A fact finder need only be capable of fairly evaluating all relevant evidence; some prior knowledge of or thoughts about a case does not automatically imply an inability in the administrative factfinder to render an impartial decision. *See Sacco,* 639 F.2d at 443; *cf. Morrissey v. Brewer,* 408 U.S. 471, 486, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484 (1972) (revocation decision should be made by someone other than officer who reported parole violation). The fact that only one examiner reviewed the file in his hotel room, or that together they took only 8 minutes to render a decision, is not sufficient to support an inference of impermissible bias on the part of either examiner. *See Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983) (Court's duty is to view the record as a whole and "to ensure claim has been fairly evaluated...."); *Feller v. Board of Education,* 583 F.Supp. 1526, 1528 (D.Conn.1984) (Administrative process merits the same respect as judicial process).

 The petitioner's final claim of procedural irregularities concerns the National Appeals Board. He believes that the Board unlawfully delegated its authority to consider his appeal because two board members apparently relied upon a summary of Mr. Ostrer's file which was prepared by a Commission staff member. As previously suggested, "those legally responsible for a decision must in fact make it, but ... their method of doing so—their though processes, their reliance on their staffs—is

largely beyond judicial scrutiny." *KFC Management Corp. v. NLRB*, 497 F.2d 298, 304 (2d Cir.1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 879, 47 L.Ed.2d 98 (1976). Most administrative decision-makers rely upon the help of support staff. The petitioner's allegations merely state an objection to reliance by two of the three members of the National Appeals Board upon administrative assistance. It has long been settled that such allegations provide no basis for overturning an administrative decision. *See Morgan v. U.S.*, 304 U.S. 1, 3, 58 S.Ct. 773, 774, 82 L.Ed. 1129 (1938); *Morgan v. U.S.*, 298 U.S. 468, 481, 56 S.Ct. 906, 911–12, 80 L.Ed. 1288 (1936).

### Conclusion

Upon review, the Court cannot render a *de novo* parole decision, nor is it authorized to order the Commission to hold a new hearing simply because it may have rendered a different decision under similar circumstances. The Court's duty is to determine whether the record rationally supports the Commission's decision. In this case, it does. The petition for a writ of habeas corpus is DENIED.

SO ORDERED.